44563. CRAWFORD v. THE STATE.
(362 SE2d 201)

HUNT, Justice.

Including one interlocutory appeal, this death penalty case is here for the third time. In its original appearance, we reversed the conviction because of the possibility that Crawford was convicted of felony murder — a crime not charged in the indictment on which he was originally tried. *Crawford v. State,* 254 Ga. 435 (1) (330 SE2d 567) (1985). After remand to the trial court, the defendant filed a motion to enjoin the state from seeking a death sentence a second time. The trial court denied the motion, and on appeal, we affirmed, holding that the state was not prohibited for any reason from "seeking

---

anew the death penalty." *Crawford v. State*, 256 Ga. 57, 58 (344 SE2d 215) (1986). The case then proceeded to trial, and the defendant was convicted of murder and sentenced to death.[1]

The facts are set forth in our previous opinion. See *Crawford v. State*, supra, 254 Ga. at 436-37. Stated briefly, the evidence shows that while defendant was recently separated from his wife, he unsuccessfully propositioned his wife's sister, threatened to "get" her, and, later that night, raped and murdered her 29-month-old daughter.

1. As we noted previously, forensic evidence was introduced at the first trial "that several head and pubic hairs consistent with those of the defendant were found on the victim's body[,]" and that "[c]arpet fibers found on the victim's body were consistent with the fibers of the carpet in the defendant's car." 254 Ga. at 437.

There was also a hair admitted in evidence at the previous trial, which ostensibly was removed in a "vaginal swabbing" of the victim, and which was consistent with hair from the defendant's arm. In the retrial, this particular hair was excluded from evidence because of the state's failure to establish a sufficient chain of custody. Defendant now argues that without this "critical piece of alleged evidence," the state's case is insufficient to establish guilt. We do not agree.

Other hair and fiber comparisons remained in evidence. Moreover, although no one actually saw defendant murder his niece, the circumstances of her disappearance, conjoined with his admissions, strongly establish his guilt. Crawford threatened to "get" the victim's mother the night the victim disappeared. Sometime after 3:00 a.m., Crawford's car was seen by a neighbor outside the victim's home, with its lights on and its engine running, and the victim's grandfather saw Crawford walking through the darkened house into the victim's bedroom. At 5:00 a.m., the victim's mother returned and discovered the victim to be missing. Soon afterwards, Crawford was seen in the area, and, when asked about the victim's whereabouts, replied "Randy [the victim's father] done it." Although he denied any memory of committing rape or murder, Crawford admitted to law enforcement officers that the victim was in his automobile at the critical time, that she would not wake up, and that he exited the car with her in his arms and returned without her. The victim's body was found in a wooded area. She had been sexually assaulted and strangled.

The evidence, viewed in the light most favorable to the jury's determination, supports the conviction for felony murder in the commission of an aggravated assault beyond a reasonable doubt. *Jackson*

---

[1] Crawford was convicted of felony murder (on an indictment properly charging that offense) on February 5, 1987. A sentencing hearing was conducted and he was sentenced to death February 6. The case was docketed in this court on April 16, 1987, and, after all parties were given extensions of time to file their briefs, the case was orally argued July 1, 1987.

*v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Defendant argues that his motion for a change of venue should have been granted.

As defendant points out, most of the prospective jurors were aware that defendant had been convicted previously of the crime for which he was now being tried. A lesser, but significant, number of prospective jurors were aware of the prior sentence. Defendant argues that the level of knowledge about the earlier proceedings was sufficient to disqualify this venire, and to require a retrial in some other venue. We do not agree. Comparatively little publicity attended the retrial of the case. Indeed, the trial court observed, "Some of the jurors made mention of a brief news account about the retrial, and that's the only evidence before this court that there has been any recent publicity." The setting of the trial was not "inherently prejudicial as a result of the pretrial publicity[.]" *Chancey v. State*, 256 Ga. 415, 430 (349 SE2d 717) (1986).

Nor did the "jury selection process show actual prejudice to a degree that rendered a fair trial impossible." Id at 431. Compare *Coleman v. Kemp*, 778 F2d 1487 (11th Cir. 1985), cert. denied *Kemp v. Coleman*, ___ U. S. ___ (106 SC 2289, 90 LE2d 730) (1986).

Here, 90 prospective jurors were examined on voir dire; of these, 40 were excused for cause. However, less than 30 were disqualified for bias resulting from prior knowledge of the case.[2] "The relevant question is not whether the community remembered the case, but whether the jurors at [this] trial had such fixed opinions that they could not judge impartially the guilt of the defendant [or the sentence that might be imposed]." *Patton v. Yount*, 467 U. S. 1025, 1035 (104 SC 2885, 81 LE2d 847) (1984).

The 50 jurors qualified in this case (to select 12 jurors and two alternates) did not have such fixed opinions. The trial court's finding that defendant could receive a fair trial in Spalding County is supported by the record. We find no error in the denial of the defendant's motion for change of venue.

3. The voir dire examination was conducted as follows: Each panel of 12 was brought into the courtroom and asked the statutory voir dire questions contained in OCGA § 15-12-164, and some general questions. Then the panel was removed to a jury assembly room, and the members of the panel were brought into the courtroom one at a

---

[2] Nine were excused for anti-death-penalty bias, one was excused for medical reasons, one was excused because she had been the defendant's school teacher, and one was excused because he had been summoned for jury duty in the previous trial of this case. Six others were excused, not because they had a fixed opinion of the defendant's guilt, but because they had a fixed opinion that the defendant should be executed if found guilty. Arguably, the pro-death-penalty bias of at least some of these six jurors was a consequence of their prior knowledge of the case.

time to undergo an individual, sequestered examination concerning their knowledge of the case and their attitudes about the death penalty.

Handley, the second prospective juror in the fourth panel, was challenged for cause by the state based on her conscientious objection to the death penalty and her stated preference for life imprisonment as a punishment. This challenge was denied on the ground that the prospective juror had testified that, in an appropriate case, she could impose a death sentence. However, she was subsequently excused for cause on another ground; she had taught the defendant in school, knew his parents, and had often transported the defendant home from ball games, and she felt she could not be an impartial juror.

Later, prospective juror Lane, number seven on this panel, reported that he had "heard one comment [in the jury assembly room] to the effect that he didn't give her a second chance, why is he getting a second chance." Prospective juror Lane testified that this kind of remark "riles me up," and he did not himself "have that attitude," and did not "understand it." He testified that he "probably was the only one that heard it." Lane identified Handley as the person making the remark to no one in particular, while reading a magazine.

The trial court re-summoned Handley, who, as noted above, had been excused, and examined her in chambers, outside the presence of the attorneys. She admitted making the comment, but stated that she was referring to "an article about cocaine, about a child not getting a second chance on cocaine . . ." She stated that she "was not referring to Eddie Crawford," pointing out: "If I had said that, I wouldn't be against the death penalty."

Handley identified two other prospective jurors who might have heard the remark, Lane (who had reported it) and Daniel.

The trial court reported its finding to the attorneys. The court noted that, during her voir dire examination, the third juror (Daniel) had been asked whether she had heard any prospective jurors comment on the case and whether she had discussed the case with any prospective juror, and had answered in the negative.

Defendant's attorney made two motions; one, that he be allowed to voir dire former prospective juror Handley again, and, two, that he be allowed to question further all of the qualified prospective jurors that were in that room at the time the remark was made, to determine whether they had heard it and whether it had affected them.

The court did not rule immediately on these motions, but ultimately denied them, as follows:

"First, as to juror number one [Handley] and juror number two [Daniel], I specifically asked juror number two whether or not she had discussed it with any other jurors, and she answered no. I further have satisfied myself, by talking with juror number one, that juror

number two is the only person that possibly could have heard it. But in addition to that, I have asked all of the qualified jurors if they have heard any opinions of other[s] or expressed any opinions themselves, and the ones that are qualified all answered that question in the negative. Based upon this, I decline to grant your motion for any further voir dire or interrogation of juror number one and juror number two."

Defendant argues that the trial court's "failure . . . to allow adequate voir dire of prospective jurors" concerning a "seriously prejudicial remark" requires the reversal of this case. We disagree.

First, all prospective jurors, before and after the incident, were questioned extensively about their knowledge, if any, of the case, and about what, if anything, they had heard.

Second, after prospective jurors completed their examinations on voir dire, they were excused. Thus, many prospective jurors whose examinations preceded that of juror Lane would not have been in the jury assembly room when juror Handley made her comment. Although it is not clear just when she made the comment, or just who was in the assembly room at the time, it does appear from the record that, of the panel of 12 prospective jurors to which Handley, Lane and Daniel belonged, eight were excused. Only one of the four who qualified was examined before Lane testified.

Third, 48 prospective jurors were examined *after* Lane reported the incident. Defendant was not denied an opportunity to question these prospective jurors as to whether any of them had overheard juror Handley's remark or any other comments made in the jury assembly room, and not a single one was shown to have heard the comment.

Finally, it is clear that prospective juror Handley, who was conscientiously opposed to the death penalty, and who was partial to the defendant, did not intend to express an opinion that the defendant receive a death sentence. Just as clearly, juror Lane was not prejudiced against the defendant by the remark. Whether or not juror Daniel was prejudiced by the comment, the defendant was afforded an opportunity to strike her for cause. Instead, he renewed his challenge to the poll, which was denied, and exercised a peremptory strike against her.

The remark at issue here did not generate a "significant possibility of prejudice," *Jordan v. Lippman*, 763 F2d 1265, 1275 (11th Cir. 1985). In these circumstances, the voir dire examination was not constitutionally inadequate.[3]

---

[3] The trial court did not immediately identify Handley and Daniel to the parties, who did not learn who was involved, besides Lane, until much later in the voir dire proceedings. Moreover, the parties were not furnished a transcript of the court's discussion of the incident with juror Handley until after the appeal was docketed in this court. Although we find no reversible error here, we would observe that had the parties been fully informed of all the

4. We find no merit to the defendant's contention that persons between the ages of 18 and 30 are unconstitutionally underrepresented on Spalding County jury lists. See *Hicks v. State*, 256 Ga. 715 (7) (352 SE2d 762) (1987).

5. The defendant next contends he was deprived of a fair opportunity to receive and utilize funds, denying him due process, equal protection, and a reliable sentencing hearing, citing *Ake v. Oklahoma*, 470 U. S. 68 (105 SC 1087, 84 LE2d 53) (1985).

"[T]he general rule is that the grant or denial of a motion for assistance of expert witnesses and other investigative services lies within the sound discretion of the trial court. . . ." *Castell v. State*, 250 Ga. 776, 783 (4) (301 SE2d 234) (1983). However, abuses of discretion may result in reversal on appeal. *Williams v. Newsome*, 254 Ga. 714, 716 (334 SE2d 171) (1985). In an appropriate case, "the due process clause could require the government, both state and federal, to provide . . . expert assistance to an indigent defendant upon a sufficient showing of need." *Moore v. Kemp*, 809 F2d 702, 712 (11th Cir. 1987). See *Thornton v. State*, 255 Ga. 434 (339 SE2d 240) (1986). The defendant argues the trial court denied him meaningful access to experts by delaying his requested hearing on the issue, refusing to hear evidence on his particular needs, and refusing his requests for a continuance. We disagree.

The defendant was represented in this trial by counsel who was retained by the defendant's family. It is not disputed that the defendant himself is indigent. His counsel filed his notice of appearance in this case on July 31, 1985. A double jeopardy claim was raised and denied, and the denial affirmed on interlocutory appeal to this court. *Crawford v. State*, supra 256 Ga. 57. The trial court received the remittitur from this court on July 12, 1986. On October 17, 1986, the trial court issued an order, scheduling a "First Proceeding" under the Unified Appeal Procedure, 252 Ga. A-13 et seq., for December 8, 1986, for the purpose of disposing of all motions filed by that date. After defense counsel notified the court of a conflict in his schedule, the date scheduled for the first proceeding was postponed to January 12, 1987.

Among the motions pending at that time was the defendant's motion for "necessary funds," which included general requests for an investigator on the ground that the case "presents complex factual evidence which requires the services of a paid investigator," for "scientific experts" because the case "involves scientific evidence which is of a critical nature and that experts in the field disagree as to the

relevant circumstances immediately, the defendant's concerns about the incident may well have been alleviated, or even eliminated.

reliability of said evidence," for a "community prejudice survey" for funds to demonstrate the invalidity of the grand and traverse jury lists in Spalding County, for funds to investigate an alleged history of discrimination by the prosecutor in the exercise of his peremptory challenges and in exercising his discretion to seek a death sentence, and for the services of a "medical doctor" to present "critical evidence in mitigation of punishment."

As the first hearing on his motion was to begin, the defendant's attorney stated that, notwithstanding the initial continuance at his request and the date for this hearing had been set several weeks previously, he would be "unprepared" to present any evidence on the motion. He requested a continuance and offered to present evidence that he was involved in two other capital cases which prevented him from adequately preparing his motion for funds. The attorney complained that he "apparently [was] not going to have an opportunity to put on evidence in support of this motion . . . I wouldn't get any relief anyway . . . and we rely on the motion as filed." Notwithstanding, the trial court granted the defendant $1,000, "initially," to use as he saw fit.

Under these circumstances, the trial court did not err by denying a continuance and proceeding at the time scheduled, over the defendant's objection that it was "impossible for us to meet the timetables that are being set by the court." Furthermore, error, if any, was alleviated by the grant of funds without an evidentiary showing of specific need and without any strings. Thus, we conclude the defendant was not harmed by any alleged denial of an opportunity for a meaningful hearing or by the failure of the trial court to grant a continuance.

Thereafter, on the third day of voir dire, the defendant's attorney informed the court that his "investigator used up the money that the court awarded us, and rather than come back to the court and have an evidentiary hearing and use up even more time trying to get funds, the family came up with some more money, another $1,000 to pay the investigator this week . . ." However, after the jury was selected, but prior to opening statements, the question of funds was raised again. This time, the defendant's attorney was given a second opportunity to present his request for funds and to do so ex parte. At that time, he informed the court that he "[felt] fairly comfortable with being able to put up a case in the guilt or innocence phase of the trial . . . [T]he investigation is fairly complete . . . The problem is in the penalty phase." He requested additional funds for a serologist, a pathologist, and a psychological expert to testify to the defendant's alcoholism and his change in personality since his return from Vietnam, but presented no specific evidence concerning the names or expenses involved in obtaining such witnesses.

As for what the defense attorney's proffer ought to contain, the Eleventh Circuit has summarized the general scope of such a proffer as follows: "[A] defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather, . . . a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial . . . In each instance, the defendant's showing must also include a specific description of the expert or experts desired; without this basic information, the court would be unable to grant the defendant's motion, because the court would not know what type of expert was needed. In addition, the defendant should inform the court why the particular expert is necessary." (Footnotes omitted.) *Moore v. Kemp*, supra, 809 F2d at 712.

At this hearing, despite the defendant's failure to present the court with any bills showing how the previously granted $1,000 had been spent, and notwithstanding his failure to name any potential expert witnesses or to estimate the likely cost of such assistance, the court awarded the defendant an additional $1,000.

Since the defendant failed to establish his specific entitlement to any funds and did not present the court with any bills showing how the previously granted $1,000 had been spent, he is in no position to contend that the trial court refused to hear evidence on his request for funds, and has failed to demonstrate that the funds the trial court did award were inadequate or came too late.

The defendant has presented no cause for reversal and a new trial.

### Sentence Review

6. The jury found as statutory aggravating circumstances that the offense of murder was committed while the offender was engaged in the commission of two other capital offenses, rape and kidnapping with bodily injury, and that the offense of murder was wantonly vile, horrible or inhuman in that it involved an aggravated battery to the victim. See OCGA § 17-10-30 (b) (2) and (b) (7).

The victim's body was discovered in a wooded area, nude from the waist down, and covered with "vegetable debris" and insect (apparently ant) bites. There were minor bruises on her face, and a laceration on the inside of her upper lip. There was an "area of hematoma or hemorrhage and some contusions" at the vaginal opening, and blood had drained outside of the vaginal canal onto her inner thighs. The vaginal canal was torn as the result of "something [being in-

serted] into the vaginal opening which was larger than it could accommodate."

"A person commits the offense of aggravated battery when he maliciously causes bodily harm to another . . . by seriously disfiguring his body or a member thereof." OCGA § 16-5-24 (a).

"A person commits the offense of rape when he has carnal knowledge of a female forcibly and against her will. Carnal knowledge in rape occurs when there is any penetration of the female sex organ by the male sex organ." OCGA § 16-6-1 (a).

"A person commits the offense of kidnapping when he abducts or steals away any person without lawful authority or warrant and holds such person against his will." OCGA § 16-5-40 (a). "[I]f the person kidnapped shall have received bodily injury . . . ," the defendant has committed the offense of kidnapping with bodily injury, which is a capital felony. OCGA § 16-5-40 (b). "A bodily injury includes any injury to the body." *Waters v. State*, 248 Ga. 355, 367 (10) (283 SE2d 238) (1981).

The evidence in this case supports the jury's finding that the defendant kidnapped and raped the victim, and committed an aggravated battery (the serious disfigurement of her vaginal canal) that was "separate and distinct . . . from the act [strangulation] causing death . . ." *Davis v. State*, 255 Ga. 588, 593 (3 c) (340 SE2d 862) (1986).

The evidence supports the jury's findings of statutory aggravating circumstances. OCGA § 17-10-35 (c) (2).

7. We do not find that the sentence of death was imposed as the result of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (3).

8. Defendant's death sentence is neither excessive nor disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of a death sentence in this case.

*Judgment affirmed. All the Justices concur.*

### APPENDIX.

*Parker v. State*, 256 Ga. 543 (350 SE2d 570) (1986); *Devier v. State*, 253 Ga. 604 (323 SE2d 150) (1984); *Allen v. State*, 253 Ga. 390 (321 SE2d 710) (1984); *Felker v. State*, 252 Ga. 351 (314 SE2d 621) (1984); *Brown v. State*, 250 Ga. 66 (295 SE2d 727) (1982); *Messer v. State*, 247 Ga. 316 (276 SE2d 15) (1981); *Justus v. State*, 247 Ga. 276 (276 SE2d 242) (1981); *Green v. State*, 246 Ga. 598 (272 SE2d 475) (1980); *Cape v. State*, 246 Ga. 520 ( 272 SE2d 487) (1980); *Thomas v. State*, 245 Ga. 688 (266 SE2d 499) (1980); *Gates v. State*, 244 Ga. 587 (261 SE2d 349) (1979); *Brooks v. State*, 244 Ga. 574 (261 SE2d 379)

690

(1979); *Collins v. State*, 243 Ga. 291 (253 SE2d 729) (1979); *Spraggins v. State*, 243 Ga. 73 (252 SE2d 620) (1979); *Davis v. State*, 242 Ga. 901 (252 SE2d 443) (1979); *Johnson v. State*, 242 Ga. 649 (250 SE2d 394) (1978); *Moore v. State*, 240 Ga. 807 (243 SE2d 1) (1978); *Gibson v. State*, 236 Ga. 874 (226 SE2d 63) (1976).

DECIDED NOVEMBER 19, 1987 —
RECONSIDERATION DENIED DECEMBER 16, 1987.

*August F. Siemon III*, for appellant.
*Johnnie L. Caldwell III, District Attorney, J. David Fowler, Assistant District Attorney, Michael J. Bowers, Attorney General, Eddie Snelling, Jr., Assistant Attorney General*, for appellee.