## 44930. LEE v. THE STATE.

(365 SE2d 99)

SMITH, Justice.

Appellant, Jesse Lee, was convicted of malice murder and armed robbery by a Walton County jury and sentenced to death. We affirm.[1]

Late in the morning of August 5, 1986, Spec Prather, who operated a wrecker service for H & W Motors in Monroe, Georgia, received a telephone call concerning a disabled automobile at the Rolling Hills trailer park.

At noon that day, the wrecker stopped on Davis Street in Monroe, picked up the defendant and his brother Roy, and left in the direction of the trailer park.

Later that afternoon, the defendant showed some friends a large amount of money, which he claimed to have won. However, Doug Robinson testified that "I talked to [the defendant] and took him aside and we talked and I asked him where did he get the money . . . and he finally came out and told me he shot somebody."

When Spec Prather failed to return that afternoon, a search was conducted, and his wrecker was found on a dirt road not far from the Rolling Hills trailer park. Prather lay slumped over inside the wrecker, shot in the head with a .22 caliber pistol.

The defendant was questioned by law enforcement officers the next day (August 6), and he told them where to find the victim's wallet. He denied being present when the victim was shot, claiming that his brothers Roy and Jimmy handled that part of it while he waited a short distance up the road in a blue-grey Ford automobile that Roy had borrowed. The defendant stated that Roy gave him $305 to hold overnight but that he was to return it to Roy the next day.

Later that day, the defendant gave a second statement. This time, he claimed he was driving a blue Chevrolet that his girl friend Sue Nett Williams borrowed from her daughter and son-in-law. Sue Nett and the defendant drove past the wrecker, turned around, and stopped to pick up Roy and Jimmy. He and Sue Nett got out and looked inside the wrecker. The defendant stated: "She [looked] in there [and] she freaked out. Like at the time I didn't know he was shot." The defendant got $330, and gave $30 to Sue Nett for borrowing the car.

On August 7, the defendant called the Monroe Chief of Police and requested an interview. He then gave a third account of the

---

[1] The crime was committed August 5, 1986. This case was tried May 11 through May 13, 1987. The jury returned its verdict as to sentence on May 13, 1987, and the court imposed sentence on May 27, 1987. The defendant filed his motion for new trial on June 8, 1987, and an amendment thereto on July 8, 1987. The motion was denied on the latter date and the case was docketed in this court August 7, 1987. The case was orally argued on October 14, 1987.

crime, in which he and Sue Nett borrowed a green 1962 Chevrolet without the owner's knowledge. They drove up to the wrecker, and the defendant saw Roy pointing a gun at the driver. He let Sue Nett out. As he was turning around, he heard the shot, and then he saw Sue Nett push the driver over and take his wallet. In this statement the defendant admitted knowing ahead of time that the driver was going to be killed.

1. The defendant argues that the evidence does not support his conviction for malice murder. He notes that in none of his statements to law enforcement officers did he admit killing the wrecker driver himself, and his admission that he knew there was going to be a killing "is clearly just a conclusion of the defendant based on his knowledge of his brother's personality." Brief of appellant, p. 10.

The defendant, however, did not merely draw an after-the-fact conclusion of the inevitability of the killing. Rather, he admitted to law officers that the killing "was in the plan," that everyone involved knew what the plan was, and that it was a necessary step in the commission of the crime to eliminate the only possible witness against them.

Moreover, the jury was not required to accept as true everything the defendant said — in fact, the jury *could* not have, given the inconsistencies in his statements, but aside from that, the state offered credible evidence establishing that (1) contrary to the defendant's statements, Jimmy Lee and Sue Nett Williams were elsewhere when the crime was committed and could not have participated in the crime, (2) the defendant and his brother Roy rode in the wrecker to the scene of the crime and *walked* back to town, (3) on his return home, the defendant had blood on his shirt and shoes, took a bath and made Sue Nett wash his shirt, and (4) notwithstanding his denials to law enforcement officers, the defendant admitted to Doug Robinson that he had shot somebody in order to obtain money.

The evidence supports the defendant's conviction for malice murder. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The defendant challenged the array of the grand and traverse juries on the ground that persons aged 18 through 29 are significantly underrepresented on the jury lists in Walton County. His challenge was overruled. Inasmuch as the defendant presented no evidence from which the trial court could have found as a fact that young persons are a cognizable group in Walton County, the trial court did not err by overruling the challenge. *Hicks v. State*, 256 Ga. 715 (7) (352 SE2d 762) (1987).

3. The day after the crime, law enforcement officers searched the residence shared by the defendant and Sue Nett Williams. They discovered and seized a pair of blood-stained shorts. The blood was ex-

amined as to type and two identifiable enzymes and found to be consistent with that of the victim. The defense contended that the shorts belonged to Sue Nett and not to the defendant. A few days before the trial, the prosecutor asked Sue Nett if they were hers. She said they were, and that the blood on them was hers, from where she had cut her hand on a screen door several days prior to the crime. A sample of her blood was drawn and examined. She was found to have the same blood type (O) as the victim, but the trial began before the enzyme comparison was completed.

The defendant moved for a continuance, on the ground that the enzyme comparison would be highly relevant to his contention that Sue Nett was involved in the crime. The district attorney responded that the enzyme results "should be back tomorrow morning," and he was confident that she was *not* involved in the crime, and that the results would be consistent with the blood being hers.

The defendant's attorney then stated to the court: "We ask you to reserve your decision on the motion for continuance and I don't think we will get into it in the morning, just see how it develops, but I felt compelled to bring it up today."

The trial court denied a continuance, stating, "Of course, if there is not a sufficient break during the trial itself for you to examine the scientific evidence when it does come in tomorrow, I will consider any motion at that time for a recess for that purpose."

As the district attorney predicted, the enzyme comparison showed that the blood on the shorts was consistent in all identifiable respects with that of Sue Nett, as well as that of the victim. However, although the defendant made no further motion in this regard at trial, he contends on appeal that the court reversibly erred by denying his motion for continuance.

Contrary to the defendant's contention, the results of the enzyme comparison did not "radically alter" either the state's theory or that of the defense; the results were equally consistent with both. The defendant has failed to demonstrate any harm from the denial of the continuance. We find no abuse of discretion in the trial court's ruling. *Ealy v. State*, 251 Ga. 426 (3) (306 SE2d 275) (1983).

4. The trial court did not abuse its discretion at the voir dire examination by requiring the defendant to rephrase his question relating to the credibility of police officers. See, e.g., *Boyer v. State*, 178 Ga. App. 372 (3) (343 SE2d 146) (1986).

5. Edward "Teenie" Towler testified for the state at the guilt phase of the trial. Towler saw the defendant and Roy Lee standing by his mailbox on Davis Street on the morning of August 5, 1986. He knew the defendant, having been imprisoned with him, and talked to him briefly. The defendant told him he was waiting for a wrecker. As they were talking, the wrecker drove up, and the defendant and his

brother got in and rode off.

Before Towler testified about this incident, the district attorney asked for a bench conference and warned the court that the witness had known the defendant in prison. The court sent the jury to the jury room and instructed the witness that he was "not to mention the fact that you knew [the defendant] in prison. . . ." The examination resumed, and the state asked Towler what the defendant was waiting for. Towler answered: "Well, you know, I came out my door to the mailbox and I seen them standing out there. I didn't have to talk to them, I asked Jesse, I say when is the last time you been in trouble; he said well, I ain't been in no trouble, I said. ·. . ."

The defendant objected and moved for a mistrial on the ground that impermissible character evidence had been elicited. The court denied the motion for mistrial. The answer was not so prejudicial as to require a mistrial. *Sabel v. State,* 250 Ga. 640 (5) (300 SE2d 663) (1983).

6. There is no merit to the defendant's contention that the state argued facts not in evidence, in violation of OCGA § 17-8-75. There was testimony in evidence that the defendant had purchased a number of items with the proceeds of the crime, and the state was entitled to refer to these purchases in its closing argument notwithstanding that the items themselves were not admitted in evidence.

7. It is well settled that the state is not limited to proving *statutory* aggravating circumstances. See, e.g., *Zant v. Stephens,* 250 Ga. 97, 100 (297 SE2d 1) (1982). Sentencing proceedings in death penalty cases are governed not only by OCGA § 17-10-30, but also by OCGA § 17-10-2, which authorizes the factfinder to hear *additional* evidence in aggravation, "including the record of any prior criminal convictions."

Although a defendant's character is not an issue at the guilt phase of the trial, "unless and until the defendant elects to make it so, . . ." *Frazier v. State,* 257 Ga. 690, 698 (16) (362 SE2d 351) (1987), it *is* an issue at the sentencing phase. *Fugitt v. State,* 256 Ga. 292, 296 (348 SE2d 451) (1986); *Fair v. State,* 245 Ga. 868, 873 (268 SE2d 316) (1980). See also *Ford v. State,* 257 Ga. 461 (1) (360 SE2d 258) (1987).

The defendant's criminal record was properly admitted in evidence at the sentencing phase of the trial, as was a letter written by the defendant from jail while awaiting this trial, in which he stated to a friend: "I am coming back, man. When I get back I am going to be crazy, man, on somebody . . . I like the way you and Linda take care of things, but I am going to kill this person . . . I want to kill this person real, real bad . . . I am going to do that, when I do that, I want you and Linda to take care [of my children] for me."

8. The defendant contends the trial court erred by failing to give a sentencing-phase charge approved in *Davis v. State,* 255 Ga. 598,

611 (18) (340 SE2d 869) (1986), relating to the principles announced by the U. S. Supreme Court in *Enmund v. Florida*, 458 U. S. 782 (102 SC 3368, 73 LE2d 1140) (1982). Although it is "the better practice" to give such a charge when more than one defendant is involved in the crime, see *Cargill v. State*, 255 Ga. 616, 643 (32) (340 SE2d 891) (1986), the failure to give it is not reversible error in the absence of a request.

9. The defendant contends the trial court erred by denying his motion for change of venue. He notes that his brother was given a change of venue and received a life sentence and argues that the only "plausible explanation for the difference in sentence for the two co-defendants was that one was granted a change of venue and the other was not."

We address the question of proportionality in Division 10, infra. We do not agree that the change of venue is the only plausible reason for the disparate sentencing results.

In order to prevail on a motion for change of venue, (1) the defendant must show such extensive and prejudicial pretrial publicity that the county in which the crime occurred *presumptively* is incapable of providing a fair trial to the defendant, or (2) he must establish from the jury selection process itself — the voir dire examination and qualification of prospective jurors — that a change of venue is necessary. *Devier v. State*, 253 Ga. 604, 608-609 (323 SE2d 150) (1984).

The defendant conceded at trial that he was satisfied with the jury selection process, and he has not shown that the pretrial publicity was so extensive and prejudicial as to require a change of venue. *Chancey v. State*, 256 Ga. 415, 430-31 (349 SE2d 717) (1986). The record supports the trial court's determination that this defendant could obtain a fair trial in Walton County. Although the question of the necessity for a change of venue in Roy's case is not before us, we note that the defendant was tried first and Roy afterwards, so that Roy's venire, unlike the defendant's, was exposed to publicity generated by a recent trial of the same crime.

10. The defendant argues that his death sentence is excessive and disproportionate because his brother, whom he characterizes as both the "mastermind" and the "triggerman," received a life sentence, while the defendant, who was a "mere abettor," got death. See *Hall v. State*, 241 Ga. 252 (8) (244 SE2d 833) (1978).

The evidence, however, gives little support to the defendant's contention that he was a "mere abettor." It shows, rather, that he was an active and willing participant in a crime that he knew would end in murder. Moreover, contrary to the defendant's contention that "all the evidence" indicates that Roy killed the victim, in fact, only the defendant's statements to law enforcement officers so indicate, and these statements, for a variety of reasons, including their inconsisten-

cies and their attempts to blame persons who could not have been involved, do not persuasively establish the identity of the killer. Other evidence, including testimony that the defendant had blood on his clothes and his admission to a friend on the afternoon of the murder that he had obtained a lot of money by shooting somebody, indicate that the defendant, and not his brother, was the actual killer.

In addition, the jury in this case considered not only the circumstances of the offense, but also the defendant's prior record including convictions for six theft offenses and two first-degree forgeries. *Horton v. State*, 249 Ga. 871 (13) (295 SE2d 281) (1982).

Considering the crime and the defendant, the death sentence is neither excessive nor disproportionate to the sentence given to the defendant's brother, or to sentences imposed in similar cases generally. See *Beck v. State*, 255 Ga. 483 (6) (340 SE2d 9) (1986).

11. The death sentence was not imposed as a consequence of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1).

12. The evidence supports the jury's finding that the murder was committed while the defendant was engaged in the commission of the offense of armed robbery, OCGA § 17-10-30 (b) (2) and that the murder was committed for the purpose of receiving money, OCGA § 17-10-30 (b) (4). OCGA § 17-10-35 (c) (2).

13. The similar cases listed in the appendix support the imposition of a death sentence in this case. OCGA § 17-10-35 (c) (3).

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 25, 1988 —
RECONSIDERATION DENIED MARCH 16, 1988.

*Michael R. Jones, Charles E. Day,* for appellant.
*John M. Ott, District Attorney, Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Assistant Attorney General,* for appellee.

APPENDIX.

*Harrison v. State*, 257 Ga. 528 (361 SE2d 149) (1987); *Beck v. State*, 255 Ga. 483 (340 SE2d 9) (1986); *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984); *Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1979); *Corn v. State*, 240 Ga. 130 (240 SE2d 694) (1977); *Young v.*

*State*, 237 Ga. 852 (230 SE2d 287) (1976); *Pulliam v. State*, 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State*, 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State*, 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State*, 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State*, 233 Ga. 861 (213 SE2d 829) (1975).