· 45977. POTTS v. THE STATE.
(376 SE2d 851)

SMITH, Justice.

This is a death penalty case. Jack Howard Potts originally was convicted and sentenced to death in Forsyth County for the murder of Michael Priest. *Potts v. State*, 241 Ga. 67 (243 SE2d 510) (1978). His death sentence for murder was set aside during federal habeas corpus proceedings, *Potts v. Zant*, 734 F2d 526 (11th Cir. 1984), and the case was remanded to Forsyth County for a retrial as to sentence. Potts' motion for change of venue was granted, and the penalty phase was retried in Richmond County. Potts was resentenced to death. He now appeals.[1]

---

[1] Potts originally was convicted not only of the murder of Michael Priest in Forsyth County, but also of kidnapping Priest in Cobb County. The Cobb County conviction was set aside in the same federal proceedings which granted relief as to sentence in the Forsyth case. *Potts v. Zant*, supra, 734 F2d 526. There have since been interlocutory appeals in both the Forsyth and the Cobb County cases. See *Potts v. State*, 258 Ga. 430 (369 SE2d 746) (1988), and *Potts v. State*, 257 Ga. 402 (359 SE2d 916) (1987). Only the Forsyth case is involved in this appeal.

The voir dire examination began in Forsyth County on November 8, 1987. The trial court granted the defendant's motion for change of venue on November 16, 1987. Trial was recommenced in Richmond County on January 4, 1988, culminating in a verdict on January 14, 1988. A motion for new trial as to sentence was filed February 15, 1988, and amended April 14, 1988. The motion, as amended, was heard on April 14, 1988, and denied May 2, 1988. A notice of appeal was duly filed, and the case was docketed in this court July 6, 1988. Oral arguments were heard October 11, 1988.

*Facts*

The evidence presented at the resentencing trial may be summarized as follows:

In the spring of 1975, Potts met 22-year-old Norma Blackwell. She left her husband and three children, and began living with Potts. In early May 1975, they were in Daytona Beach, Florida. While there, Potts killed a man. Blackwell helped Potts bury his bloody shirt and they returned to Georgia. (Potts later confessed to this murder.)

Potts and Blackwell spent the night of May 7, 1975, in Forsyth County. The next day, after Potts shot a window out of his mother's car (because "he was upset"), Gene Snyder and Elaine Glaze stopped by in Snyder's pickup truck. Blackwell and Potts sought a ride with them to Marietta where Potts had left his automobile. As the four of them rode to Marietta, Potts, who was driving, reached across the seat and shot Snyder.

Snyder testified:

[I heard] a sound like a firecracker going off in my ear, and I shook my head and wondered what happened, and I turned around and looked, and he had a gun in his hand, and I seen blood run down my shirt, and I figured then I'd been shot.

So, I took the key out of the switch and . . . the truck slowed down . . . I told him to take me to the doctor . . . and he said he would if I'd put the key back in the switch.

So, I should have knowed better, but I did put the key back in the switch, and then he shot me again right through the sinus and down in the throat somewhere. . . .

[The first shot] went through my sideburn . . . and came out [my] right ear. . . .

[After the second shot], I tried to hold his hand, and . . . he either hit me or his gun went off again. . . .

Snyder pretended to pass out. As Potts came around the truck (now stopped) to pull him out, Snyder took the ignition key out of the switch and threw it out of the window. Potts left Snyder by the side of the road and wiped down the inside of the truck to erase any fingerprints.

Potts walked to a nearby house, where Michael Priest, his pregnant wife, and her parents had just begun to eat supper. Potts, covered with blood, claimed he had been in an accident and needed a ride. Michael Priest volunteered to take him to a hospital.

While Potts was gone, Elaine Glaze asked Norma Blackwell if she could just leave. Blackwell told her that Potts would kill her if she left; Blackwell had seen him kill before, in Florida.

Potts returned with Priest in the latter's car. Priest saw Snyder "covered in blood" and stated, "My God, that man is hurt. Somebody needs to help him." Potts pointed a gun at him and told Priest he had done it and would "do" Priest "like that." The two women entered the car, and Potts ordered Priest to drive off.

Glaze testified:

> Michael, he kept saying that he had a wife and baby and a baby on the way. That he didn't want to die. Over and over. That he would do anything, and he would give him anything if he just didn't hurt him. And it went on like that for awhile.

> And Michael . . . started saying, "Oh, God, don't hurt me because I haven't done anything to you." And that's when [Potts] told him, "You'd better pray to me. I'm your God." And Michael began to pray to him.

They stopped on a dirt road. Potts took Priest into some high weeds, forced him to his knees, and shot him in the back of the head. He returned to the truck, and, according to Glaze,

> said, "Now it's your turn. Come on." And I was begging to Norma [Blackwell], and Norma said, "Don't hurt her Jack. Don't kill her. She'll do anything you want to." And . . . I said, "I will." And he laughed and got in the front seat and began to drive. . . .

After changing clothes and burning their old ones, the three drove to Cumming, where Potts stole a dealer "tag" to replace the license plate on Priest's car. They disposed of Priest's personal possessions and papers, and drove toward Florida.

They stopped to pick up a hitchhiker, but when Potts told him they were going "to hell and back," the hitchhiker decided not to ride with them.

Glaze escaped when Potts stopped to get a motel room. When Potts returned to the car and discovered Glaze was gone, he and Blackwell drove on, spending the night in the car. The next morning, they picked up two hitchhikers. As they drove south, Potts bragged that he had killed a man the day before.

They were spotted near Morgan, Georgia, by police officer Rickey Weaver, who had received information over his radio that Potts had been driving recklessly. Weaver directed him to stop, but Potts re-

fused. As Weaver chased Potts, he received another call on the radio informing him that the driver was wanted in connection with a murder in North Georgia.

Potts stopped his car and got out. According to Blackwell, Potts intended to shoot Weaver until he saw that the officer was armed with a shotgun. Officer Weaver testified that he stepped out of his car carrying his shotgun and told Potts to lie face down on the ground. Instead, Potts got back into his car and sped off.

Weaver chased Potts for several miles. As he topped a hill, Potts, who had stopped again, fired several shots at Weaver. Weaver stopped his car and fired at Potts, who took off again. Weaver resumed the chase, but soon had to quit because Potts had shot a hole in his radiator and his car overheated.

Potts and his companions broke into a farmhouse, stole some guns and ammunition, and were preparing to steal a car when two more policemen drove up. In the ensuing shootout, Potts and one of the policemen were wounded, and one of the hitchhikers was killed.

Potts was taken into custody, where he remained for 12 years. On September 19, 1987, while awaiting a retrial in this case, Potts broke out of the Forsyth County jail, using a gun furnished him by a 21-year-old female jailer who thought "he was a friend." After a shootout, Potts was apprehended not far from the jail. The sentencing trial took place three and one-half months later.

### Enumerations of Error

1. This court affirmed the denial of Potts' double jeopardy claim based on prosecutorial misconduct at the original trial. *Potts v. State*, 257 Ga. 402 (359 SE2d 916) (1987). Following the return of the case to superior court, a jury was selected in Forsyth County for the resentencing trial. However, the trial court granted Potts' motion for a change of venue before the oath was administered to the jury. See OCGA § 15-12-139. Thereafter, Potts again sought to bar a retrial on double jeopardy grounds, claiming now that the grant of his motion for a change of venue was "tantamount to declaring a mistrial."

The trial court granted Potts' motion for change of venue after determining that Potts could not get a fair trial in Forsyth County. Since the jury was not sworn, jeopardy did not attach, and there was neither a mistrial, nor anything "tantamount" to a mistrial. *Shaw v. State*, 239 Ga. 690 (1) (238 SE2d 434) (1977). Hence, Potts' double jeopardy claim is without merit. Moreover, although we need not decide whether the court would have been justified in granting a change of venue even if jeopardy *had* attached, we note that the change of venue was granted at the defendant's request, and that "a motion by the defendant for mistrial is ordinarily assumed to remove any barrier

to reprosecution. . . ." *United States v. Jorn*, 400 U. S. 470, 485 (91 SC 547, 27 LE2d 543) (1971).

2. The trial court did not abuse its discretion as to the defendant's requests for expert assistance. *Crawford v. State*, 257 Ga. 681 (5) (362 SE2d 201) (1987).

3. Before trial, Potts filed a motion asking that he not be manacled in the presence of the jury. The court stated that it had asked the sheriff "to submit his proposal for security during the trial of this case, and we will reserve ruling on that particular motion until he's done that."

The sheriff's plan, as submitted, included shackling Potts with leg irons during the trial (his hands, however, would remain free). At the defendant's request, the trial court conducted a hearing on the issue.

The state presented evidence that Potts had threatened to disrupt the proceedings, to throw things at the judge, and to assault the district attorney. The sheriff testified that Potts had "severe mood swings." He had fired his lawyer three or four times in the previous week. He had torn his clothes and flushed them down the commode. He had "set the jail on fire," and the sheriff had to remove all flammable objects from his cell. Potts had obtained a gun and attempted an escape not long before trial. Moreover, Potts' original escape plan had been to use the gun to take his own attorney hostage.[2]

The court noted that "both counsel tables in the courtroom including the one occupied by the state and the one occupied by the defense have been draped or covered in such a way that the feet and legs of those seated at those tables are not visible to the jurors." In addition, the court stated that Potts would be brought into the courtroom before the jury entered, and would stay until the jury left. The court found from the evidence presented that shackling was justified and that "the use of alternative restraints" would not satisfactorily assure "courtroom security [or] the personal security of Mr. Potts and security personnel," nor assure Potts' continued presence at trial.

There was no error. *Hicks v. State*, 256 Ga. 715 (9) (352 SE2d 762) (1987). Compare *Moon v. State*, 258 Ga. 748 (12) (b) (375 SE2d 442) (1988).

4. The court did not err by failing to excuse two prospective jurors who saw the defendant in handcuffs outside the courtroom where one of the prospective jurors was not challenged by the defendant, and both prospective jurors testified that what they observed would

---

[2] Evidence of Potts' plan to take his attorney hostage was presented at an earlier hearing in which an issue was raised about the attorney's conflict of interest. At the hearing on shackling, the court stated: "We have already heard considerable evidence on other motions in this case that I think bears on [the shackling] question."

not affect their fairness and impartiality. Cf. *Ford v. State*, 257 Ga. 461 (5) (360 SE2d 258) (1987).

5. There was no improper restriction in the scope of the six-day-long voir dire examination. *Childs v. State*, 257 Ga. 243 (6) (357 SE2d 48) (1987). See *King v. Lynaugh*, 850 F2d 1055 (5th Cir. 1988).

6. Death-qualification of prospective jurors is not improper. *Lockhart v. McCree*, 476 U. S. 162 (106 SC 1758, 90 LE2d 137) (1986). The trial court's death-qualification rulings meet the standards of *Wainwright v. Witt*, 469 U. S. 412 (105 SC 844, 83 LE2d 841) (1985), and *Pope v. State*, 256 Ga. 195 (7 e) (345 SE2d 831) (1986).

7. Potts is a white male, and therefore lacks standing to raise an equal-protection claim under *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), to the prosecutor's peremptory challenges of female prospective jurors.[3] *Skipper v. State*, 257 Ga. 802 (5) (364 SE2d 835) (1988).

8. The record does not show that the state failed to disclose exculpatory information. On the contrary, the state opened its files to the defendant. Cf. *Reed v. State*, 249 Ga. 52 (3) (287 SE2d 205) (1982).

9. Potts objected to the introduction of statements made by him as he was attempting to break out of jail, relying on the notice provisions of OCGA § 17-7-210. The trial court sustained the defendant's objection to the introduction of the statements and granted the defendant's request to instruct the jury to disregard the statements. Potts made no motion for mistrial after the curative instructions were given. Pretermitting whether the statements at issue here come within the purview of OCGA § 17-7-210, since the trial court granted all the relief Potts asked for at trial, he now has nothing to complain about. *Jarrells v. State*, 258 Ga. 833 (5 b) (375 SE2d 842) (1989).

10. The trial court obtained the defendant's parole file and reviewed it in camera for potentially mitigating evidence. Potts argues this action was insufficient to satisfy his right of access to mitigating evidence. We disagree. A defendant has access to other, non-confidential information about his behavior in prison, and we do not find it necessary to ignore the confidentiality provisions of OCGA § 42-9-53 in order to satisfy the defendant's right to present mitigating evidence. *Pope v. State*, supra, 256 Ga. 195 (22).

11. Potts planned to call a fellow inmate to testify in mitigation concerning Potts' character. The prosecutor talked to the inmate before trial and was told by the inmate that Potts had admitted com-

---

[3] Because Potts lacks standing to raise the issue, we need not decide whether peremptory challenges based on sex are addressable under *Batson*.

mitting other murders for which he had never been prosecuted. The defense discovered this before calling the inmate as a witness, and decided not to use the witness, who ultimately did not testify for either side.

That the witness was untrustworthy was not the state's fault. There was no improper prosecutorial interference with a defense witness or with the defendant's effort to present a case in mitigation. Cf. *Ross v. State*, 254 Ga. 22 (4) (326 SE2d 194) (1985); *Mincey v. State*, 251 Ga. 255 (16) (304 SE2d 882) (1983).

12. It was not error to exclude evidence of Potts' ineligibility for parole if given a life sentence. *Horton v. State*, 249 Ga. 871 (4) (295 SE2d 281) (1982). See also *Quick v. State*, 256 Ga. 780 (9) (353 SE2d 497) (1987).

13. As we stated in *Alderman v. State*, 254 Ga. 206, 210 (8) (327 SE2d 168) (1985):

> When a case is retried as to sentence, both the state and the defendant are entitled to offer evidence on the issue of guilt or innocence, not because the validity of the conviction is at issue, but because the jury needs to examine the circumstances of the offense (as well as any aspect of the defendant's character or prior record) in order to decide intelligently the question of punishment.

It is not error to inform the resentencing jury that the defendant has already been found guilty, and to tell the jury that its duty is to determine the punishment to be imposed, considering "all of the evidence" presented at the resentencing trial, and "all of the facts and circumstances of the case." Transcript, Vol. 41 at 2851, 2857-59. See *Alderman v. State*, supra at 212 (11 b).

14. Potts complains of the state's use of a prior conviction for murder based on a guilty plea that was not shown to be voluntary. See *Pope v. State*, supra at 195 (17) (holding that "once the defendant raises the issue of intelligent and voluntary waiver with respect to prior guilty pleas, the burden is on the state to establish a valid waiver").

Potts raised before trial the issue of intelligent and voluntary waiver as to his 1975 Florida guilty plea. The state responded by announcing that because no transcript of the plea colloquy could be located, and the attorneys involved had no independent recollection of the plea proceedings, the state would not introduce the guilty plea or the conviction based thereon. Instead, the state offered the testimony of witnesses from Florida to prove the commission of the offense.

The state did not use a prior conviction in aggravation; it proved the commission of the crime itself, with evidence and testimony (in-

cluding Potts' confession). It was not error to do so. *Devier v. State*, 253 Ga. 604 (9) (323 SE2d 150) (1984); *Jefferson v. State*, 256 Ga. 821, 827 (8 b) (353 SE2d 468) (1987). See also, e.g., *Richardson v. Johnson*, 864 F2d 1536 (V) (11th Cir.) (1989).

15. After being recaptured, Potts sought to help the jailer who had furnished him a weapon by offering to "give" the authorities "some dead bodies" if they would "cut [her] loose." Potts objected to the introduction of this statement at trial on voluntariness grounds. That objection was unsuccessful, and he now argues that the statement should have been excluded because it fails to establish the commission by Potts of other murders. It was, he contends, mere "bragging" about "things that never occurred."

Potts' present objection was not timely raised at trial. We note, however, that the relevance of the statement did not turn on proof that Potts actually committed additional murders. See *Frazier v. State*, 257 Ga. 690, 701 (21) (362 SE2d 351) (1987).

16. Testimony by Elaine Glaze to what Norma Blackwell told her Potts would do to her if she tried to escape was admissible to explain why Glaze waited as long as she did to flee. OCGA § 24-3-2. Blackwell's reference to a murder in Florida was cumulative to other evidence establishing that Potts committed murder in Florida. *Gaskins v. State*, 250 Ga. 386 (297 SE2d 729) (1982).

17. Potts did not object to testimony by the jailer who assisted his escape attempt. However, it was not improper, as Potts now contends it was, for her to testify that she had pled guilty and was testifying as part of a plea agreement. *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972).

18. The record supports the trial court's findings on the admissibility of Potts' confession to the Florida murder. See *Parks v. State*, 254 Ga. 403 (1) (330 SE2d 686) (1985). The confession was properly admitted into evidence.

19. There was no error in the admission of crime-scene photographs. *Hicks v. State*, supra, 256 Ga. 715 (13).

20. The trial court's instructions on credibility of witnesses and reasonable doubt were not erroneous. *Felker v. State*, 252 Ga. 351 (13 c) (314 SE2d 621) (1984).

The trial court did not err by defining armed robbery and by stating that armed robbery is a capital felony. OCGA § 17-10-30 (b) (2); *Putman v. State*, 251 Ga. 605 (13) (308 SE2d 145) (1983). The jury was clearly instructed that the death penalty was sought for the offense of *murder* and that the offense of armed robbery was an alleged contemporaneous capital felony that would support a death sentence for murder.

The court's instructions on mitigating circumstances were sufficient. *Romine v. State*, 251 Ga. 208 (10 b) (305 SE2d 93) (1983). See

also *Davis v. State*, 255 Ga. 598 (22) (340 SE2d 869) (1986); *Ford v. State*, 257 Ga. 461 (2) (360 SE2d 258) (1987).

The court did not err by telling the jury its verdict must be unanimous. *Romine v. State*, 256 Ga. 521, 525 (350 SE2d 446) (1986).

21. The trial court did not abuse its discretion by allowing jurors to take notes.

22. Objections to the form of the verdict must be stated when the verdict is returned; they cannot be "reserved." *Romine v. State*, supra, 251 Ga. 208 (7). Absent any objection to the form of the verdict, the trial court did not err by failing to require the jury "to amend its written verdict to reflect more precisely its intent." Ibid.

The evidence supports the jury's finding that the offense of murder was committed while the defendant was engaged in the commission of the armed robberies of Gene Snyder and Michael Priest. OCGA §§ 17-10-30 (b) (2); 17-10-35 (c) (2).

23. Items discarded from Priest's vehicle by the defendant were properly introduced into evidence. Evidence that Priest's wife was pregnant and that Priest had begged for his life on behalf of himself and the family he would leave behind did not violate *Booth v. Maryland*, 482 U. S. 496 (107 SC 2529, 96 LE2d 440) (1987). See *Kinsman v. State*, 259 Ga. 89 (10) (376 SE2d 845) (1989); *Holiday v. State*, 258 Ga. 393 (11 f) (369 SE2d 241) (1988).

24. Any impropriety in the state's closing argument was cured when the trial court sustained the defendant's objection and gave curative instructions to the jury to disregard any reference to a third person possibly involved in the Florida murder.

25. Potts contends the prosecutor was guilty of misconduct when he used prior statements to refresh the memories of some of his own witnesses. This contention is without merit. *Davis v. State*, 249 Ga. 309 (3) (290 SE2d 273) (1982).

Nor do we find misconduct in the prosecutor's opening statement or closing argument.

26. Our death penalty procedures are not unconstitutional for any reason alleged.

27. The attorney whom the defendant planned to kidnap during his escape attempt was disqualified by the court on conflict-of-interest grounds from representing Potts, on motion by both the state and the (present) lead defense attorney. The trial court did not err by granting relief sought by both sides.

The trial court did not err by failing to excuse sua sponte two other attorneys representing Potts (neither of them his lead attorney), one of whom was an ex-prosecutor and the other of whom was a former judicial law assistant, where neither had worked on the case previously. Compare *Pope v. State*, 257 Ga. 32 (3) (354 SE2d 429) (1987).

28. The trial court did not deny Potts his right to represent himself. *Faretta v. California*, 422 U. S. 806 (95 SC 2525, 45 LE2d 562) (1975). Although Potts stated at a pretrial hearing that he wished to represent himself, he withdrew his request after the trial court gave him time to reconsider and reflect on the consequences of self-representation.

29. Potts has not shown that he could not get a fair trial in Richmond County. Compare *Devier v. State*, supra, 253 Ga. 604 (4).

30. The trial court did not err by refusing to consider Potts' challenge to the Forsyth County grand jury which returned the indictment. "Because his conviction long since has been affirmed, this challenge comes too late." *Blankenship v. State*, 258 Ga. 43, 45 (5 b) (365 SE2d 265) (1988). The challenge to the Richmond County traverse jury was properly denied. *Hicks v. State*, supra at 715 (7).

31. "A criminal defendant is not entitled to a daily transcript." *Rutledge v. State*, 245 Ga. 768, 772 (267 SE2d 199) (1980).

32. Nothing in the Unified Appeal Procedure forces a defendant to give up any constitutional rights or compels him to speak. *Sliger v. State*, 248 Ga. 316 (282 SE2d 291) (1981).

33. Potts was granted funds to employ a private psychiatrist. He raised no contention of incompetence, and the trial court did not err by refusing to order a competence hearing sua sponte. Compare *Baker v. State*, 250 Ga. 187 (297 SE2d 9) (1982).

34. Potts' motion to recuse the trial judge was properly denied. *Smith v. State*, 250 Ga. 438 (1) (298 SE2d 482) (1983); *Hunnicutt v. Hunnicutt*, 248 Ga. 516 (1) (283 SE2d 891) (1981).

35. Potts argues that it "violates contemporary norms of decency" to hold him "on death row for 13 years, then retry him, and then hold him for who-knows-how-long prior to actually executing him. . . ." Appellant's brief at p. 120. If Potts means by this assertion that his death penalty should be set aside, we disagree.

> The "waiting for execution is intolerably cruel" argument is . . . gossamer. . . . [T]erminally ill cancer patients suffer that fate, quite innocently. . . . [T]he fact that innocent people serve out a "death sentence" imposed by disease is important for two reasons. In the first place the condition is far from unusual; cruel it may be, but unusual it is not. It is a fortunate adult who has not been touched by or at least been aware of such a death. In the second place, this grief is visited capriciously upon the general population, young and old. Although the condition was not imposed by the state as punishment for murder, the innocent victims nevertheless experience the emotional and mental grief of anticipated death. Many of them also endure physical pain and debility, suffer-

ing which is not imposed by the state upon convicted murderers. Thus, although waiting for death can be cruel, it is hardly out of the ordinary run of human experience.

All real punishment imposes pain of some kind and awaiting death doubtlessly imposes mental pain upon those to be executed. . . . Much of the general public views condemned killers with indifference, if not with fear and loathing. Who among the general public is upset about the fact that killers suffer emotional grief awaiting execution? Few indeed, I would judge. The many people who deem the death penalty to be just desserts are not morally offended that the condemned are impelled to focus their minds upon the unknown fate that awaits them.

Little, *Another View*, U. of Fla. L. Rev., Vol. XXXVI, pp. 200, 201-02 (Spring 1984).

36. The sentence of death was not imposed under the influence of impermissible passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1).

37. Potts' death sentence is neither excessive nor disproportionate to sentences imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-30 (c) (3). The similar cases listed in the Appendix support the death penalty imposed in this case.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Moon v. State*, 258 Ga. 748 (375 SE2d 442) (1988); *Lee v. State*, 258 Ga. 82 (365 SE2d 99) (1988); *Harrison v. State*, 257 Ga. 528 (361 SE2d 149) (1987); *Beck v. State*, 255 Ga. 483 (340 SE2d 9) (1986); *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984); *Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Tucker v. State*, 245 Ga. 68 (263 SE2d 109) (1980); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1979); *Corn v. State*, 240 Ga. 130 (240 SE2d 694) (1977); *Young v. State*, 237 Ga. 852 (230 SE2d 287) (1976); *Pulliam v. State*, 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State*, 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State*, 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State*, 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State*, 233 Ga. 861 (213 SE2d 829) (1975).

DECIDED FEBRUARY 23, 1989 —
RECONSIDERATION DENIED MARCH 15, 1989.

McCurdy & Candler, Michael Mears, for appellant.

Rafe Banks III, District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, for appellee.