Ivron G. BUTLER, Appellant,

v.

STATE of Missouri, Respondent.

No. WD 61053.

Missouri Court of Appeals,
Western District.

Jan. 7, 2003.

Rebecca L. Kurz, Kansas City, for appellant.

Stephanie Morrell, Asst. Atty. Gen., Jefferson City, for respondent.

Before JOSEPH M. ELLIS, Chief Judge, ROBERT G. ULRICH, Judge, and PATRICIA BRECKENRIDGE, Judge.

JOSEPH M. ELLIS, Chief Judge.

Ivron Butler was convicted by a Clay County jury of forcible sodomy, § 566.060, RSMo Cum.Supp.1993; and felonious restraint, § 565.120, RSMo 1994; as well as two counts of armed criminal action, § 571.015, RSMo 1994. Butler was found to be a prior and persistent offender under §§ 558.016 and 557.036, RSMo 1994, and was sentenced to consecutive terms of life imprisonment for forcible sodomy, § 566.060.2, RSMo Cum.Supp.1993; seven years for felonious restraint, § 558.011.1(3), RSMo Cum.Supp.1993; and 100 years each for the two counts of armed criminal action, § 571.015.1, RSMo 1994. Butler's convictions were affirmed by this court on direct appeal. *State v. Butler*, 24 S.W.3d 21 (Mo.App. W.D. *banc* 2000).

Butler subsequently filed a Rule 29.15 motion for post-conviction relief. Following an evidentiary hearing, the motion court denied his motion finding that trial counsel's decision not to challenge inadmissible statements by the State's forensic chemist about a hair sample comparison was reasonable trial strategy and could not have prejudiced Butler. The motion court further found that counsel was not ineffective for failing to retain a hair analysis expert for the defense. Butler brings this appeal challenging those findings.

Viewed in the light most favorable to the underlying verdict, the evidence presented at trial established the following:

[A]t approximately 9:30 p.m. on the evening of August 31, 1993, two boys, sixteen-year-old J.L. and thirteen-year-old N.E., were sitting by a lake and boat storage area at the Lakeview Terrace Mobile Home Court in Clay County where they lived. A man walked by a couple of times and asked them whether they had seen someone waiting around who was supposed to help him take his boat out of storage. When the boys told him they had not, the man left. The man later came back, and offered to pay them money to help him get his boat ready to take to the lake. J.L. and N.E. agreed, and the man left again after telling the boys he was going to his house to get the combination to unlock the boat storage area. He returned five to ten minutes later and told the boys he could not find the combination, but he knew where they could jump over the fence.

J.L. and N.E. began walking through a wooded area around the fence and the man followed behind. As they were walking, the boys heard the man ask, "Who is going to be the hero?" J.L. and N.E. turned around and saw that the man had a gun in his hand. He told the boys that, if they cooperated, they would be all right. The man ordered N.E. to lay on the ground, and ordered J.L. to lay on top of N.E. The man tied J.L.'s hands behind his back with a rope, moved him onto the ground next to N.E., and tied N.E.'s hands behind his back. The man had anal intercourse with J.L.

While the boys were on the ground, N.E. tried twice to look at the man's face; however, the man told N.E. to turn his head and pushed N.E.'s head away. While the man was still sodomizing J.L., N.E. jumped to his feet and ran. As N.E. was running away, the man told him to stop or he would shoot him, but N.E. escaped. After briefly chasing N.E., the assailant turned around and came back to J.L. He untied J.L., told him not to say anything, and ran away. N.E. went to the house of a friend whose father was a police officer. The friend's father reported the incident to the police. J.L. ran to his own home. Ten minutes after he arrived home, the police came. A crime scene technician collected his clothing, which was new and had never been worn before that day. The police recovered an unidentified head hair from J.L.'s shirt and an unidentified pubic hair from J.L.'s underwear.

The following year, Mr. Butler, who lived in the same mobile home park, became a suspect. In April of 1995, 20 months after the crime occurred, the police collected hair and blood samples from Mr. Butler. Mr. Butler was subsequently indicted on one count of forcible sodomy, one count of felonious restraint, and two counts of armed criminal action.

Mr. Butler's first trial on these charges ended in a mistrial. The second trial took place on July 22–24, 1996. Both N.E. and J.L. testified regarding the assailant's appearance. N.E. testified that the assailant was a man about 30 years old, of average weight, roughly five feet ten inches tall, with a couple of days' beard stubble on his face, wearing a ball cap with black letters on the front, and a Jack Daniels T-shirt.

In contrast, in his initial statement to police right after the incident, J.L. had described the assailant as being a stocky-built white male, twenty to thirty years old, five feet seven inches tall, weighing approximately 170 pounds, with brown curly hair which extended "a little bit" beyond the ball cap in front, with a couple of days' beard stubble on his face, and wearing a Jack Daniels T-

shirt and a silver wristwatch with a metal wristband. At trial, J.L. gave a more general description, stating that the assailant was five foot seven or eight, wearing dark clothing and a baseball hat.

At the time of the trial, Mr. Butler was 32 years old, five feet nine inches tall, 185 to 190 pounds in weight, with straight brown hair, a rather severe receding hairline, and a mustache. The State offered no evidence that he had ever had curly brown hair, that he recently gained weight, that he had clothing or a watch matching that worn by the perpetrator, or that he had a boat in the boat storage area or had a combination to the lock to the boat storage area. He said he did not. Neither N.E. nor J.L. could identify Mr. Butler by sight or voice as the assailant. On the other hand, Mr. Butler lived in the trailer park and was familiar with it, and he admitted that he was in the park—he said he supposed he was in his trailer—at the time of the crime. He had no witnesses to his whereabouts. And, like the perpetrator, he could be described as being of average height and weight and about 30 years old.

In addition to the boys' testimony and the general testimony about Mr. Butler's appearance and where he lived, the State offered the expert testimony of Darvine Duvenci. Ms. Duvenci was employed by the Regional Crime Lab in Kansas City, where she worked in the trace evidence and serology section of the chemistry department. Her work with trace evidence involves the analysis of microscopic items of evidence such as hair, fibers, paint chips, glass, and other materials, while serology involves the genetic analysis of body fluids. Ms. Duvenci had been a forensic chemist for twelve years, and estimated that she performed approximately 100 hair comparisons a year.

Ms. Duvenci testified as to the limitations of comparative microscopy of hair. She stated unequivocally that such use of such comparisons to positively identify individuals is *not* accepted by the scientific community as reliable. Ms. Duvenci testified that, while she is able to state that hair from an unidentified individual "matches" the hair of an identified individual, she is unable to determine what percentage of the population could have contributed the unidentified hair. Thus, according to Ms. Duvenci, the state of the science of microscopic hair comparison is such that experts cannot state that a person with a certain type of hair characteristics will show up a certain number of times in the population.

Ms. Duvenci was then asked to give her opinion about her microscopic comparison of the one unidentified head hair and the one unidentified pubic hair found on J.L.'s clothing with the samples of head, pubic and facial hairs from Mr. Butler. She said she was unable to find any significant differences between characteristics in the unidentified head and pubic hair found on J.L.'s clothing and the sample head and pubic hair collected from Mr. Butler that would cause her to exclude Mr. Butler as the source of the unidentified hair. She testified that, were she to interchange the unidentified head and pubic hair with those of Mr. Butler, she would not be able to distinguish them.

Ms. Duvenci also testified that Mr. Butler's pubic hair sample and the unidentified pubic hair found in J.L.'s underwear had spots on the medulla, and that she could not remember previously finding such spots in her examination of over 1200 hair samples. She also testified that in her personal experience with

hair comparisons, she could not recall finding two unidentified hairs from totally different body regions of a person that both matched hairs from those same parts of the body of another person. According to Ms. Duvenci, this finding of a match of both a pubic hair and a head hair was "like double significance of evidence." She did not suggest that scientific studies or the state of the scientific art supported giving such a "double significance" to this evidence, however. Rather, she acknowledged that neither she nor forensic scientists in general were able to positively identify individuals based on hair comparison. She thought two matches were twice as meaningful.

Despite testifying the scientific community does not accept use of hair comparison evidence to identify a particular person, Ms. Duvenci went on to state that she felt there was a "very strong probability" that the two unidentified hairs collected from J.L. came from Mr. Butler. And, when asked by the prosecutor whether she believed "within a reasonable degree of certainty" that the unidentified hairs were in fact from Mr. Butler, Ms. Duvenci answered in the affirmative.

In his defense, Mr. Butler testified that he did not commit the crimes, and he offered evidence that he did not fit the description of the assailant. When asked if the hairs were his, was there a way they could have gotten on J.L., he said that he would typically swim on Tuesdays, since that was the day he took classes, and so it was his only day off work. He recalled that on Tuesday, August 31, a boy had gotten a gash on his forehead while roughhousing, and had to

have the cut treated. He said he recalled the incident because he had not seen someone get a cut on the head at the pool ever before, and that the boy who got the cut looked like J.L. He said he supposed it possible hair was transferred to the victim either while they were both swimming and the roughhousing was occurring in the pool, or that hair from his towel was transferred to the victim since people had put their towels in the same area of the pool. He had gone to class that night and assumed he had had returned home after class ended at 9:50 p.m. that night.

The trial court denied Mr. Butler's motion for acquittal, and submitted the case to the jury. The jury convicted Mr. Butler on all counts and he was sentenced as a prior and persistent offender under §§ 558.016 and 557.036 RSMo 1994.

*Butler*, 24 S.W.3d at 46–48 (Stith dissenting) (emphasis in original).[1]

On appeal, Appellant challenged the sufficiency of the evidence to support his convictions. In relevant part, Appellant contended that the forensic expert's testimony that, to a reasonable degree of certainty, the hairs found on J.L.'s clothing were Butler's and that the match of hair from two different body parts was "like double significance of evidence" was not entitled to any weight in determining whether the evidence sufficiently established that he was the perpetrator of the crimes because that testimony "was not based upon scientific principles that are generally accepted in the relevant scientific community." *Id.* at 35 (Breckenridge concurring). Appellant contended that without that improper

---

**1.** The facts stated by the dissent are quoted merely because they reflect a slightly more complete statement of the evidence presented at trial. This statement of facts does not conflict with the statement of facts set forth on behalf of the plurality of this Court in Judge Lowenstein's concurrence. *See Butler,* 24 S.W.3d at 22–24 (Lowenstein concurring).

testimony the evidence was not sufficient to find him guilty beyond a reasonable doubt.

A plurality of this Court affirmed Appellant's conviction. In his concurrence, Judge Lowenstein stated that the aforementioned testimony had to be considered in determining the sufficiency of the evidence because Appellant failed to object to the lack of foundation for that testimony at trial. *Id.* at 25–26 (Lowenstein concurrence). Judge Lowenstein further commented that the jury was entitled to give that evidence whatever weight it deemed appropriate in assessing Appellant's guilt and that this court must view that evidence in the light most favorable to the verdict. *Id.* at 24, 26. Furthermore, Judge Lowenstein found that the evidence presented at trial, with or without the offending testimony, was sufficient to support the verdict. *Id.* at 26–31. Judge Hanna joined in that concurrence. Writing separately, Judge Spinden joined Judge Lowenstein's concurrence noting that "[b]ecause of the lack of objection, we need not concern ourselves with whether the content of Duvenci's testimony was proper in the absence of plain error." *Id.* at 35.

In a separate opinion, joined by Judges Ulrich and Smith, Judge Breckenridge concurred with Judge Lowenstein's finding that the challenged testimony by the forensic expert had to be considered in assessing the sufficiency of the evidence because Appellant failed to object to that evidence based upon a lack of scientific foundation at trial. *Id.* at 35 (Breckenridge concurring). Judge Breckenridge also agreed that the evidence was sufficient to support the verdict when the expert's testimony was considered and viewed in accordance with the proper standard of review. *Id.* However, Judge Breckenridge agreed with the dissent that

"Ms. Duvenci's testimony that, to a reasonable degree of certainty, the hairs found on J.L.'s clothing were from Mr. Butler and that a match of hair from two body parts was 'like double significance of evidence' was inadmissible because it was not based upon scientific principles that are generally accepted in the relevant scientific community." *Id.* Judge Breckenridge noted that "[h]air comparison testimony which purports to identify a specific individual as the source of the hair is contrary to accepted scientific principles." *Id.* at 38. Judge Breckridge further stated:

> Ms. Duvenci's testimony that, within a reasonable degree of certainty, the hairs found on the victim came from Mr. Butler, and her opinion that matching two hairs from two separate parts of the body was 'like double significance of evidence,' are statements for which there is no scientific basis and that such evidence should have been excluded if a proper objection had been lodged, and that without said evidence there would not have been sufficient evidence to make a submissible case. Proof from which a reasonable juror could find guilt beyond a reasonable doubt is not established by the evidence that Mr. Butler was a resident of the trailer park who fit the general description of the assailant; that the hairs found on the victim's clothing matched Mr. Butler's head hair and unusual pubic hair, and the hairs could have come from Mr. Butler or another individual whose hairs exhibited the same microscopic characteristics; that Mr. Butler lacked an alibi; and that his defense theory of transference of hair to the victim's clothing was questionable. This evidence raises only a suspicion or conjecture that Mr. Butler was the perpetrator of the crimes and does not prove such beyond a reasonable doubt. Nevertheless, defense counsel did not object to the admissibility of Ms. Duven-

ci's positive identification and quantification testimony, so that evidence is properly considered in determining whether a submissible case was made. When considering all the evidence that was before the jury without objection, I believe there was sufficient evidence of Mr. Butler's guilt beyond a reasonable doubt.

*Id.* at 41 (internal citations omitted). Judge Breckenridge went on to state:

In his briefs and his oral argument before this court en banc, Mr. Butler's counsel expressly stated that his failure to object to Ms. Duvenci's positive identification and quantification testimony was part of his trial strategy. Mr. Butler's counsel mistakenly believed that the proper challenge to the lack of foundation for Ms. Duvenci's testimony was to object that the evidence was not sufficiently reliable to permit submission of the case to the jury. He did not believe that it was necessary to dispute the admissibility of the evidence. Therefore, Mr. Butler's counsel decided not to object to Ms. Duvenci's testimony because he did not want it to look as though he was trying to hide something by objecting, and he thought he could discredit Ms. Duvenci's testimony on cross-examination.

* * *

By following the rule of law established by the Supreme Court in *Washington,* the result is an affirmance of the conviction based upon all of the evidence because there was not objection to the incompetent evidence, as a matter of trial strategy. Mr. Butler argues that a conviction upon evidence which was incompetent to prove guilt beyond a reasonable doubt violates Mr. Butler's rights. As Judge Robertson noted in his concurring and dissenting opinion in

[*State v.*] *Meanor,* 863 S.W.2d [884] at 892 [(Mo.1993)], however, the constitutional rights of a defendant, such as Mr. Butler, are adequately protected by the availability of post-conviction relief under Rule 29.15. Under this rule, Mr. Butler has the ability to assert a claim of ineffective assistance of his trial counsel for failing to object to the admissibility of Ms. Duvenci's testimony. Any determination of whether Mr. Butler would have a valid claim for post-conviction relief, should such motion be filed, is properly left to future proceedings.

*Id.* at 45.

After this Court affirmed his conviction, Butler filed a Rule 29.15 motion for post-conviction relief. In relevant part, Butler claimed that trial counsel's failure to object to the inadmissible testimony of the forensics expert, thereby allowing the State to establish a submissible case, constituted ineffective assistance of counsel. Butler also argued that trial counsel was ineffective for failing to retain and consult with an independent hair comparison expert, who could have pointed out various problems with the testimony of the State's forensic expert.

Following an evidentiary hearing, on December 21, 2001, the motion court denied Butler's motion for post-conviction relief. The motion court found that trial counsel's decision not to object to the inadmissible testimony of the forensic expert constituted reasonable trial strategy and that Butler failed to establish that he was prejudiced by counsel's failure to object. The motion court also determined that, even though Butler presented evidence that he could have retained an expert who found items to contest in the testimony of the State's expert, it was reasonable trial strategy for trial counsel not to consult with an independent expert in order to avoid calling further attention to the hair

comparison testimony. Butler brings two points on appeal from that judgment.

■ Our review of the motion court's denial of a Rule 29.15 motion is limited to determining whether the findings and conclusion of the motion court are clearly erroneous. *Rule 29.15(k)*. "Findings and conclusions are clearly erroneous if, after a review of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000).

■ "To prevail on an ineffective assistance of counsel claim, [Appellant] must show that (1) trial counsel's performance was deficient in that he failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances and (2) the deficient performance prejudiced [Appellant]." *State v. Rich*, 950 S.W.2d 337, 339 (Mo.App. W.D.1997) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). Appellant must establish both prongs of this test in order to prevail, and if he fails to satisfy either prong, we need not consider the other. *State v. Simmons*, 955 S.W.2d 729, 746 (Mo. banc 1997).

In his first point, Butler argues that the motion court clearly erred in finding that trial counsel's failure to object to the inadmissible testimony of the State's expert was reasonable trial strategy and that the failure to object did not result in any prejudice to Butler. The motion court found that counsel's decision not to challenge the admissibility of the testimony in order to discredit the expert on cross-examination was reasonable trial strategy. The motion court also found that Butler could not have been prejudiced by counsel's failure to object to the testimony because even without that testimony the result would not have been different.

■ "In arguing ineffectiveness a movant must overcome a strong presumption that counsel's failure to object was sound trial strategy." *Helmig v. State*, 42 S.W.3d 658, 679 (Mo.App. E.D.2001). "If a failure to object to a statement is based on reasonable trial strategy, then no ineffective assistance of counsel can be shown." *Chaney v. State*, 73 S.W.3d 843, 851 (Mo. App. S.D.2002).

Trial counsel testified at the 29.15 hearing that he chose not to object to the positive identification and quantification testimony by the forensic expert based upon his trial strategy. Counsel testified that he did not think any potential challenge to the admission of that testimony had much chance of success and that he thought he could surprise the expert by challenging that testimony on cross-examination.

■ However, "[t]he mere assertion that conduct of trial counsel was 'trial strategy' is not sufficient to preclude a movant from obtaining post-conviction relief based on a claim of ineffective assistance of trial counsel." *State v. Galicia*, 973 S.W.2d 926, 934 (Mo.App. S.D.1998). "For 'trial strategy' to be the basis for denying post-conviction relief, the strategy must be reasonable." *Id.*

During the 29.15 hearing, when asked if he had consulted any of the case law to determine whether he had a basis for a motion *in limine* or an objection to the expert's positive identification and quantification testimony, counsel did not directly answer the question. Counsel testified that he had thought it might be possible to raise some type of challenge to the admissibility of the evidence, but that he did not like his chances of prevailing on any such challenge and that he thought it would be better to surprise the expert on cross-examination.

Counsel also testified, however, that he knew that the primary evidence of guilt against Butler was the hair comparison evidence and that the forensics expert would offer the positive identification and quantification testimony at trial based upon her testimony in Butler's first trial. Counsel further testified that he extensively reviewed treatises and articles on hair comparison analysis and was certain that there was no scientifically accepted basis for the forensics expert to offer that testimony. Armed with that knowledge, counsel clearly should have been aware that he was almost certain to succeed on a motion *in limine* under *Frye* and that the challenged testimony would be found inadmissible. Under *Frye,* in order "for an expert witness' testimony to be admissible, the testimony must be based on scientific principles that are generally accepted in the relevant scientific community." *Callahan v. Cardinal Glennon Hosp.,* 863 S.W.2d 852, 860 (Mo. banc 1993).

■ Furthermore, our case law establishes that "'[t]he *Frye* rule clearly deals with admissibility rather than submissibility,'" *State v. Love,* 963 S.W.2d 236, 242 (Mo.App. W.D.1997) (quoting *Callahan,* 863 S.W.2d at 860), and that "[a]dmissibility only becomes an issue if there is a timely and specific objection." *Callahan,* 863 S.W.2d at 860. As noted in Judge Breckenridge's concurring opinion:

> In his briefs and his oral argument before this court en banc, Mr. Butler's counsel expressly stated that his failure to object to Ms. Duvenci's positive identification and quantification testimony was part of his trial strategy. Mr. Butler's counsel mistakenly believed that the proper challenge to the lack of foundation for Ms. Duvenci's testimony was to object that the evidence was not sufficiently reliable to permit submission of the case to the jury. He did not believe

that it was necessary to dispute the admissibility of the evidence.

*Butler,* 24 S.W.3d at 45 (Breckenridge concurring). Counsel pursued this strategy notwithstanding Missouri case law holding that a defendant is not allowed to "blissfully ignore the requirement to object to evidence based on the *Frye* doctrine and then 'back-door' the *Frye* issues into the [case] under the guise of a sufficiency of the evidence argument." *Id.* at 42.

Based on the foregoing, it is apparent that counsel's trial strategy in not objecting to the testimony was formed on the basis of either erroneous interpretations of the law or a failure to sufficiently review the relevant case law. Counsel could not have made an intelligent and informed decision about trial strategy without adequately assessing his chances of success in asserting a *Frye* challenge and the consequences of failing to make such a challenge. Given the existence of a meritorious objection to the positive identification and quantification testimony, the State's obvious need to rely upon the hair comparison evidence, and the inability of counsel to later challenge the reliability of that testimony in arguing the insufficiency of the evidence, the strategy adopted by counsel simply was not reasonable.

The trial court clearly erred in finding that counsel's decision not to challenge the positive identification and quantification testimony was the result of reasonable trial strategy. By grossly miscalculating his chances of succeeding on a motion *in limine,* failing to adequately research that issue, and mistakenly believing that he could later object to the reliability of the testimony when he challenged the sufficiency of the evidence, counsel failed to conform to the degree of skill, care and diligence of a reasonably competent attorney.

Having determined that Butler established the performance prong of the *Strickland* analysis, we must next determine whether he was prejudiced by counsel's errors. "To prove prejudice, a defendant must show a 'reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.'" *State v. Clay,* 975 S.W.2d 121, 135 (Mo. banc 1998) (*State v. Shurn,* 866 S.W.2d 447, 468 (Mo. banc 1993)).

As demonstrated by Judge Stith's dissenting opinion and Judge Breckenridge's concurring opinion in Butler's direct appeal, but for the unsound strategy of trial counsel in failing to object to the inadmissible testimony of the State's expert, there is a reasonable likelihood that Butler would not have been convicted. *See Butler,* 24 S.W.3d at 60 (Ellis dissenting). Indeed, six of the ten judges participating in Butler's direct appeal agreed that without the forensics expert's inadmissible testimony, the evidence presented by the State at trial was insufficient to make a submissible case. *Id.* at 41 (Breckenridge, C.J. concurring, joined by Ulrich and Smith, JJ.) ("[W]ithout [the forensics expert's inadmissible testimony] there would not have been sufficient evidence to make a submissible case."); *Id.* at 45–46 (Stith, J. dissenting, joined by Ellis, J. and Kennedy, Sr. J.) (holding that the forensics experts testimony was so deficient in weight and credibility as to be entitled to little weight and that the evidence presented at trial was insufficient to support Butler's conviction and that "the remaining evidence ... [does not provide] a sufficient factual basis for the jury to find beyond a reasonable doubt that Mr. Butler was the perpetrator of the crime"). Thus, counsel's failure to object permitted Butler to be convicted, whereas a proper and timely objection would have precluded a conviction based on the evidence as presented at trial. This is prejudice. The motion court erred in finding otherwise.

In sum, trial counsel's strategy did not conform to the degree of skill, care and diligence of a reasonably competent attorney, and Butler was clearly prejudiced thereby. *See Butler,* 24 S.W.3d at 60 (Ellis dissenting). We must, therefore, reverse the motion court's judgment.

Butler acknowledges that ordinarily a finding that a movant received ineffective assistance of counsel will result in the cause being remanded for new trial, but he contends that the proper remedy in this case would be for this Court to vacate his convictions and discharge him from his sentences. Butler claims that the sentences cannot stand because he would have succeeded in challenging the sufficiency of the evidence to support his convictions on direct appeal if counsel had properly objected to the inadmissible testimony of the forensics expert. Butler argues that this gives rise to double jeopardy issues.

The problem with Butler's argument is that we cannot know with any certainty how the trial would have evolved had defense counsel properly objected to the inadmissible testimony. In *State v. Kinkead,* 983 S.W.2d 518, 519 (Mo. banc 1998), the Missouri Supreme Court held that the "[e]rroneous admission of evidence does not preclude retrial 'even though when such evidence is discounted there may be evidentiary insufficiency'" because the State is entitled to rely upon the rulings of the trial court in determining what evidence to produce at trial. *Id.* (quoting *State v. Wood,* 596 S.W.2d 394, 398 (Mo. banc 1980)). The logic behind that holding is equally applicable where inadmissible evidence has been admitted due to the ineffective assistance of defense counsel. The State is entitled to make decisions regarding what evidence to produce at trial based upon the challenges made by the

defendant. The admission of otherwise inadmissible evidence without challenge from the defendant may well cause the State to choose not to submit additional admissible evidence that would be cumulative to that evidence. From the record, it is impossible to say with any certainty that the State would not have been able to make a submissible case had defense counsel properly objected to the testimony and the trial court ruled on that objection. *See Id.*

The judgment is reversed and the case is remanded to the motion court with directions to sustain the Rule 29.15 motion and grant the defendant a new trial.[2]

All concur.

---

2. Having determined that trial counsel was ineffective for failing to challenge the inadmissible testimony of the forensics expert, we need not address Butler's second claim on appeal related to whether counsel was ineffective for failing to retain and consult with an independent hair comparison expert.