S04A0589. CRAWFORD v. THE STATE.
(597 SE2d 403)

THOMPSON, Justice.

In 1984 Eddie Crawford was convicted and sentenced to death for the murder of his 29-month-old niece, Leslie English. This first conviction was reversed on appeal to this Court based on an ambiguity in the jury's verdict. *Crawford v. State*, 254 Ga. 435 (330 SE2d 567) (1985). Crawford was then retried in 1987, whereupon he was again convicted and sentenced to death. *Crawford v. State*, 257 Ga. 681 (362 SE2d 201) (1987). Crawford's subsequent state and federal habeas petitions failed. See *Crawford v. Head*, 311 F3d 1288 (2002), cert. denied, 540 U. S. 956 (124 SC 408, 157 LE2d 293) (2003). On October 15, 2003, Crawford filed an extraordinary motion for new trial that included a request for DNA testing of certain items not

---

[17] *Johns v. State*, 239 Ga. 681, 683 (238 SE2d 372) (1977).
[18] Id. See *Watkins v. State*, 237 Ga. 678 (229 SE2d 465) (1976).

previously tested or used as evidence at his trial. For the reasons set forth below, we conclude that this appeal has been properly classified as an application for discretionary appeal, and we affirm the trial court's denial of Crawford's request for DNA testing.

1. Upon the denial of his extraordinary motion for new trial and the denial of his related motion for DNA testing, Crawford filed a notice of appeal in the trial court and a brief in this Court. This Court construed Crawford's brief as an application for discretionary appeal, granted that application, and granted a stay of execution in order to consider, not only the merits of Crawford's case, but also any questions concerning the proper form of appeal applicable in such cases.

At least prior to the 2003 amendment of OCGA § 5-5-41 which added subsection (c), the denial of an extraordinary motion for new trial unrelated to an original appeal could only be appealed by the filing of an application for discretionary appeal in the proper appellate court. OCGA § 5-6-35 (a) (7). Crawford argues, however, that he is entitled to a direct appeal of the trial court's denial of his request for DNA testing based upon the following portion of the recent amendment to OCGA § 5-5-41:

> The petitioner or the state may appeal an order, decision, or judgment rendered pursuant to this Code section.

OCGA § 5-5-41 (c) (13). We conclude that this language emphasizes the General Assembly's intent that the denial of a motion seeking DNA testing made as part of an extraordinary motion for new trial be recognized as an appealable issue, but we also conclude that the filing of an application for discretionary appeal is the proper form of appeal in such a case. Concluding otherwise would yield the absurd result that the denial of an extraordinary motion for new trial would be appealable only as a discretionary appeal while the denial of a motion seeking DNA testing filed as *part* of that extraordinary motion for new trial would be appealable directly.

2. Crawford contends the trial court erred both by failing to conduct a hearing on his request for DNA testing and by denying that request for DNA testing. We disagree with both contentions.

(a) The newly-adopted DNA testing statute requires a trial court to conduct a hearing only if a defendant's motion "complies with the requirements of paragraphs (3) and (4)" of the statute. OCGA § 5-5-41 (c) (6) (A). The trial court found that Crawford had failed to comply with the requirement of paragraph (3) that a defendant must show in his or her motion for DNA testing that

> [t]he requested DNA testing would raise a reasonable probability that the [defendant] would have been acquitted if the

results of DNA testing had been available at the time of conviction, in light of all the evidence in the case.

OCGA § 5-5-41 (c) (3) (D). Crawford argues that this requirement, along with the other requirements of paragraphs (3) and (4), may be satisfied by a mere assertion in a motion seeking DNA testing that the requirement has been met. Crawford is correct in this argument insofar as it regards paragraph (4), which requires merely that a petitioner "state" that his or her motion for DNA testing is not being made for the purpose of delay and that the request for DNA testing is either being made for the first time *or*, if made previously in another court, has never been granted previously. OCGA § 5-5-41 (c) (4). These two prerequisites in paragraph (4) are simple matters that require no detailed explanation in a petitioner's motion. In contrast, however, paragraph (3) requires that the petitioner "show" certain things, including how the possible results of the requested DNA testing would in reasonable probability have led to the petitioner's acquittal if those hypothetical results had been available at the time of the petitioner's original trial. OCGA § 5-5-41 (c) (3). Requiring a petitioner to "show" a possible DNA testing result and to "show" the relevance of that hypothetical result is not tantamount to requiring the petitioner to "prove" the hypothetical result will be obtained through actual testing. However, if the DNA testing results hypothesized in a petitioner's motion, even when assumed valid, would not in reasonable probability have led to the petitioner's acquittal if those results had been available at trial, a hearing on the petitioner's motion requesting DNA testing would be unnecessary.

(b) Upon our review of the trial record and the record of Crawford's extraordinary motion for new trial, we conclude the trial court did not err in concluding that Crawford's motion for DNA testing failed to set forth a showing that the requested DNA testing might have yielded results that in reasonable probability would have led to his acquittal if those results had been available at his original trial. We find that the trial court, after referencing discussions of Crawford's requests for DNA testing in other courts under other legal standards, properly weighed Crawford's hypothesized DNA testing results against the overwhelming evidence actually presented at Crawford's trial under the proper Georgia statutory standard. See OCGA § 5-5-41 (c) (3) (D).

The evidence at Crawford's trial clearly supports the following synopsis of the events surrounding Leslie English's murder. On the evening leading up to the murder, the victim and a number of her cousins were being watched by their grandfather as some of the adults in the family spent the evening at a social club. Crawford arrived at the social club and asked his estranged wife to dance with

him. When she refused, Crawford grabbed her shirt and was ejected from the club. Crawford then went to his father-in-law's home at about 11:30 p.m. and bought and drank beer with the victim's mother, who was one of his sisters-in-law. The victim's mother refused Crawford's invitation for her to spend the night with him, and she then walked to one of her sister's homes. Crawford confronted the victim's mother at her sister's home, stomped his foot on a coffee table, grabbed and shoved the victim's mother, and yelled "I'll fix you" as the victim's mother left. Sometime shortly after 3:00 a.m., the victim's grandfather observed Crawford walking through the grandfather's home in the dark while holding a cigarette lighter, an observation that was confirmed later by Crawford's own statement to police. At approximately the same time, one of Crawford's brothers-in-law observed Crawford's automobile pulling up to the victim's grandfather's house and then departing shortly afterward.

At some point while Crawford was in the grandfather's house, Crawford got into bed with two nieces (other than the victim) and a nephew. The nephew testified that Crawford hugged and kissed his sister and then him and made the unusual plea, "Wanda [the victim's mother's first name], please don't tell." Shortly afterward, the victim was discovered missing from her grandfather's home. Ultimately, the victim's partially-unclothed, beaten, and sexually-assaulted body was discovered asphyxiated to death on a wooded roadside.

After the victim's disappearance, Crawford gave inconsistent statements about his whereabouts to various family members and to investigators. At certain times, Crawford claimed he had slept on a couch in a home belonging to relatives; however, that claim was disproved by one relative's statement that the relative had been up several times during the night and had not observed Crawford on the couch. Crawford claimed at other times that he had slept in his automobile in front of another relative's home; however, that claim was disproved by witnesses who were at that home shortly after the victim's disappearance. A shirt that Crawford had been wearing on the night of the murder was discovered hidden behind a cabinet. The front tail of the shirt was stained with blood in a location consistent with Crawford having raped the victim and having inflicted the injuries noted during the victim's autopsy. Crawford's wife identified three items of bed linens that were discovered with the victim's body as having been taken from Crawford's home. She also testified that Crawford had cleaned his automobile the day after the murder and that Crawford had removed his socks from his automobile, had placed the socks in a trash bag, and had thrown the bag to the lot across the street. The socks were recovered by law enforcement officers; on them were two head hairs consistent with Crawford's and a fiber consistent with the carpet in Crawford's automobile. On the bed linens were a

number of hairs consistent with Crawford's and the victim's head hairs, a hair consistent with Crawford's pubic hair, and a fiber consistent with the carpet in Crawford's automobile. Two hairs consistent with the victim's head hair were found in Crawford's automobile. Crawford admitted in a statement to investigators that he remembered having the unresponsive victim in his automobile on the night of the murder and remembered carrying the victim away from his automobile.

Upon our review of the trial evidence, which is summarized above, and of the trial court's order denying Crawford's request for DNA testing of items related only peripherally, if at all, to Crawford's case, we conclude that the trial court did not err in denying Crawford's request for DNA testing made within his extraordinary motion for new trial. We reach this conclusion because, even assuming the reality of the DNA testing results Crawford has hypothesized, such results would not in reasonable probability have led to Crawford's acquittal, or to his receiving a sentence less than death, if they had been available at Crawford's trial. See OCGA § 5-5-41 (c) (3) (D).

3. In light of the foregoing, we hereby dissolve the stay of Crawford's execution previously entered by this Court.

*Judgment affirmed. All the Justices concur, except Fletcher, C. J., and Benham, J., who dissent.*

FLETCHER, Chief Justice, dissenting.

Recognizing that errors in the criminal justice system may lead to the execution of innocent persons, the legislature enacted OCGA § 5-5-41 (c) to help insure that only those who are actually guilty will be put to death at the hands of the State. To achieve this laudable goal, the statute plainly states that once the petitioner has satisfied certain requirements, "the court **shall** order a hearing." By denying Crawford's right to a hearing to determine whether DNA evidence exists that is testable and might lead to a different result at trial, the majority ignores this plain language and undermines the very purpose of the statute. The majority allows its revulsion to the undeniably heinous nature of the crime to deny Crawford the due process demanded by the statute. For these reasons, I dissent.

1. OCGA § 5-5-41 (c) provides a process by which a person previously convicted of certain crimes may seek to have DNA testing done in an effort to challenge his conviction. A key part of this process is a hearing at which the petitioner and district attorney are permitted to present evidence by affidavits or testimony.[1] In providing for this process, the Georgia legislature was responding to a national

---

[1] OCGA § 5-5-41 (c) (6) (C) and (D) (parties may also submit additional memoranda of law or evidence within 30 days after the hearing).

concern about innocent persons being wrongfully convicted and newly available DNA testing that could right those previous wrongs.[2] "It's about doing what is right," said Senator David Adelman, a lead sponsor of the bill.[3]

The language of the statute is, admittedly, a little confusing, but a careful examination reveals the legislature's clear intent to insure a fair process by which our criminal justice system could take advantage of the great advances in DNA technology. OCGA § 5-5-41 (c) (3) and (4) dictate the requirements a petitioner must meet in his petition in order to be granted a hearing. Subsection (c) (6) (A) then provides that once the trial "court determines that the motion complies with the requirements of paragraphs (3) and (4) of this subsection, the court shall order a hearing to occur. . . ." The majority mistakenly reads this provision to allow the court to judge the merits of the petition without granting a hearing. In doing so, however, the majority completely ignores subsection (c) (6) (E), which provides that the purpose of the hearing is, in part, to "allow the parties to be heard on the issue of whether the petitioner's motion complies with the requirements of paragraphs (3) and (4) of this subsection." If the court were allowed to judge the merits of the petition without a hearing, subsection (c) (6) would be rendered meaningless, contrary to our duty to read the statute so as not to render any portion of it meaningless.[4] A sensible reading of the statute that honors all its language is that a petitioner must verify in his petition that he can make the showings set forth in subsections (c) (3) and (4), and that if he meets this pleading-type requirement, the court shall hold a hearing to determine if the petitioner can prove what has been pled.

A closer examination of the requirements set forth in subsections (c) (3) and (4) demonstrate that this reading is inherently logical. According to subsection (c) (6) (E), one purpose of the hearing is to allow the parties to be heard on "whether upon consideration of all the evidence there is a reasonable probability that the verdict would have been different if the results of the requested DNA testing had been available at the time of trial." But this same standard is also one of the requirements that must be met in the verified petition in order for a

---

[2] See Melissa T. Rife, *Peach Sheets – Criminal Procedure*, 20 Ga. St. U.L.Rev. 119, 120 (2003) (quoting statistics showing that 114 inmates nationwide, including three from Georgia, had been exonerated based on newly-available DNA evidence). As of May 14, 2004, the number of inmates exonerated was 143. Innocence Project, available at http://www.innocenceproject.org.

[3] Id. at 119.

[4] *Houston v. Lowes of Savannah, Inc.*, 235 Ga. 201, 203 (219 SE2d 115) (1975) (basic rule of construction that a statute should be construed "to make all its parts harmonize and to give a sensible and intelligent effect to each part[, as i]t is not presumed that the legislature intended that any part would be without meaning.").

hearing to be granted under subsection (c) (3).[5] Because the statute contemplates an evidentiary hearing to determine if the requirements of paragraph (3) have been met, it only makes sense to treat those requirements as preliminary pleading-type requirements in the verified petition. The majority instead construes paragraph (3) to require the petitioner to present all the evidence in the verified petition, which is wholly inconsistent with the statute's logic and purpose. The majority's construction also ignores the fact that a petitioner seeking DNA testing most often will not have counsel because the statute does not authorize the appointment of counsel.[6]

2. Crawford alleges detailed facts in his verified petition showing that: potential DNA evidence in the form of blood stains exists on items seized by the police from the victim's home shortly after the crime; this evidence was unknown to Crawford's trial attorney because the police report was suppressed by the State;[7] Crawford's defense at trial was that someone else had committed the crime; other persons who had access to the 29-month-old victim on the night of the crime had a history of sexually abusing children; the evidence has been viewed by Crawford's counsel; the evidence is currently in the possession of the Spalding County Sheriff's Department; and a chain of custody can be established for the evidence. Upon reviewing Crawford's petition and the State's response, I conclude that Crawford has satisfied the requirements of subsections (3) and (4) and that the trial court erred in summarily denying the motion for DNA testing without a hearing.[8]

3. The State argues, and the majority agrees, that DNA evidence could not result in a different outcome at trial because of the "overwhelming" evidence of guilt. A closer examination of the evidence, however, demonstrates that while it was "sufficient," it was not so strong as to preclude the reasonable possibility that DNA evidence pointing to another perpetrator would have resulted in a different outcome in light of all the evidence. The potentially available DNA evidence exists on blood-stained items seized from the victim's home shortly after the crime, including the victim's baby blanket, bed linens from the bed where the victim slept, and men's trousers that

---

[5] OCGA § 5-5-41 (c) (7).

[6] See also *Gibson v. Turpin*, 270 Ga. 855, 859-860 (513 SE2d 186) (1999) (no right to counsel beyond direct appeal). Other state statutes do provide for the appointment of counsel in DNA post-conviction proceedings. See Kathy Swedlow, Don't Believe Everything You Read: A Review of Modern "Post-Conviction" DNA Testing Statutes, 38 Cal. W. L. Rev. 355, 364-365 (2002).

[7] The existence of this evidence was first disclosed in response to an Open Records Request, under OCGA § 50-18-70, during post-conviction proceedings.

[8] See also *Dick v. State*, 248 Ga. 898, 899 (287 SE2d 11) (1982) (under OCGA § 5-5-41 (a), which applies to the typical extraordinary motion for new trial, a hearing is required if the petition sets forth facts, that if proven, would authorize relief).

belonged to someone other than Crawford. This blood-stained evidence conflicts with the state's theory and other evidence at trial showing that the victim was killed in Crawford's home. If the DNA evidence on these items matches the victim and a person other than Crawford, then the new DNA evidence clearly raises a reasonable possibility that a different result would have occurred at trial.[9]

The State's case relied heavily on "matching" hair, blood, and fiber evidence. The reliance on the microscopic hair analysis is particularly troubling because the prosecutor repeatedly argued that the hair evidence was "matching," and that one hair sample and another were "identical," "the same," and "identical matches." It has now been well-established that microscopic analysis (as opposed to DNA analysis) of hair samples cannot establish an identical match or provide any type of positive identification.[10] Although the prosecutor also argued that blood found on Crawford's shirt matched the victim's blood, there was absolutely no evidence of the type of blood found on the shirt, much less any evidence of a "match." While other blood evidence collected from Crawford's home was presented, the evidence showed only that the blood was type O, which was the blood type of both the victim and Crawford.[11] The fiber evidence consisted of fibers found on the victim's pajama top that were consistent with fibers from Crawford's car. However, the evidence showed that the week before the crime, the victim had ridden with her mother in Crawford's car at least two times. Finally, the State's case also relied upon Crawford's statements to police following lengthy interrogations.

Numerous defendants who made confessions have been exonerated based on DNA evidence.[12] Likewise, numerous defendants

---

[9] On the other hand, DNA evidence matching Crawford and the victim would conclusively link Crawford to the victim.

[10] See, e.g., *Scott v. State*, 581 So.2d 887, 892 (Fla. 1991) ("it is important to recognize that hair comparisons do not constitute a basis for positive personal identification"); *State v. Faircloth*, 394 SE2d 198, 202 (N.C. App. 1990) ("[u]nlike fingerprints, however, comparative microscopy of hair is not accepted as reliable evidence to positively identify a person"); *State v. Butler*, 24 SW3d 21 (Mo. App. 2000), rev'd on other grounds, 108 SW3d 18 (2003) ("[a]s [the expert] acknowledged in her testimony, and as the authoritative articles confirm, there is no scientific basis for testifying that a hair comes from a particular individual"); *Williamson v. Reynolds*, 904 F. Supp. 1529, 1556 (E.D. Okla. 1995) (holding that microscopic hair analysis does not satisfy Daubert test for admissibility), aff'd, 110 F.3d 1508 (10th Cir. 1997) (Williamson was later exonerated by DNA evidence; information available at the Innocence Project website: http://www.innocenceproject.org/case/display_profile.php?id=59, last visited May 11, 2004); *Knighten v. State*, 829 So.2d 249 (Fla. Dist. Ct. App. 2002) (granting DNA testing where prosecutor relied heavily on "matching" microscopic analysis of pubic hair). See generally Clive A. Stafford Smith and Patrick D. Goodman, *Forensic Hair Comparison Analysis: Nineteenth Century Science or Twentieth Century Snake Oil*, 27 Colum. Hum. Rts. L. Rev. 227 (1996).

[11] DNA testing was not available at the time of trial.

[12] Diana L. Kanon, *Will the Truth Set Them Free? No, But the Lab Might: Statutory Responses to Advancements in DNA Technology*, 44 Ariz. L. Rev. 467 (2002) (citing The

convicted based on hair comparison evidence have been exonerated based on DNA evidence.[13] In fact, according to one analysis, "hair misidentification has caused more wrongful convictions than any other individualization science."[14] While these facts do not establish that the potential DNA evidence would have changed *this case*, they illustrate the need that led to the enactment of this statute in the first place. In eviscerating OCGA § 5-5-41, the majority has made it far less likely that this statute will achieve its laudable purposes, and far more likely that the execution of innocent people will occur.

I am authorized to state that Justice Benham joins in this dissent.

DECIDED JUNE 7, 2004 —
RECONSIDERATION DENIED JUNE 28, 2004.

*Mark E. Olive, Thomas H. Dunn*, for appellant.
*William T. McBroom III, District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General*, for appellee.

---

Innocence Project study that of 62 persons exonerated by DNA evidence, 24% had been convicted based upon false confessions); Welsh S. White, *Confessions in Capital Cases*, 2003 U. Ill. L. Rev. 979, 983 (2003) ("[d]ata drawn from DNA-cleared cases also support the conclusion that police-induced confessions are a leading cause of wrongful convictions in capital cases.").

[13] The Innocence Project (21 of first 70 persons exonerated based on DNA evidence had been convicted based, in part, on microscopic hair comparisons), available at http://www.innocenceproject.org.

[14] Craig M. Cooley, *Forensic Individualization Sciences and the Capital Jury: Are Witherspoon Jurors More Deferential to Suspect Science than Non-Witherspoon Jurors?*, 27 S. Ill. U. L.J. 477, 510-511 and n. 237 (2003) (citing studies).