**THIRD DIVISION**
**ELLINGTON, P. J.,**
**BETHEL and GOBEIL, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**May 30, 2018**

# In the Court of Appeals of Georgia

A18A0214. EARNEST RAY WHITE v. THE STATE.

BETHEL, Judge.

Earnest Ray White began serving a life sentence in 1996 following his conviction for aggravated assault, burglary, and kidnapping.[1] He has consistently maintained his innocence, and in 2015 sought to re-open his case pursuant to OCGA § 5-5-41 (c), which provides those convicted of felony offenses with the ability to request DNA testing of evidence if, among a number of other factors, the identity of the perpetrator of the offense was at issue at trial. Because an improper legal standard

---

[1] This Court affirmed his convictions and denied reconsideration of his appeal. *See White v. State*, 233 Ga. App. 24 (503 SE2d 26) (1998). The Supreme Court granted certiorari but also affirmed his conviction. *See White v. State*, 271 Ga. 130 (518 SE2d 113) (1999).

was applied below, we vacate the order of the trial court and remand the case for further proceedings.

OCGA § 5-5-41 (c) (1) provides that, subject to provisions regarding extraordinary motions for new trials, "a person convicted of a felony may file a written motion before the trial court that entered the judgment of conviction in his or her case for the performance of forensic [DNA] testing." OCGA § 5-5-41 (c) (3) and (4) further provide that such motion must be verified by the petitioner and must show or provide a number of items of information regarding the evidence to be tested, including its location, who possesses it, and the results of any other DNA testing conducted by either the petitioner or the State during the original prosecution of the case. Assuming the petitioner complies with the filing requirements set forth in OCGA § 5-5-41 (c) (3) and (4), the trial court is required to hold a hearing on the motion. OCGA § 5-5-41 (c) (6). The petitioner must satisfy the filing requirements and persuade the judge that there is a reasonable probability that the trial verdict would have been different if the results of the requested DNA testing (which are assumed to be valid for purposes of the motion) had been available at the time of the petitioner's trial. If the petitioner carries this burden, the motion is to be granted where each of the following requirements have been established:

2

(A) The evidence to be tested is available and in a condition that would permit the DNA testing requested in the motion;

(B) The evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect;

(C) The evidence was not tested previously or, if tested previously, the requested DNA test would provide results that are reasonably more discriminating or probative of the identity of the perpetrator than prior test results;

(D) The motion is not made for the purpose of delay;

(E) The identity of the perpetrator of the crime was a significant issue in the case;

(F) The testing requested employs a scientific method that has reached a scientific state of verifiable certainty such that the procedure rests upon the laws of nature; and

(G) The petitioner has made a prima facie showing that the evidence sought to be tested is material to the issue of the petitioner's identity as the perpetrator of, or accomplice to, the crime, aggravating circumstance, or similar transaction that resulted in the conviction.

OCGA § 5-5-41 (c) (7); *see also Crawford v. State*, 278 Ga. 95, 97 (2) (a) (597 SE2d 403 (2004) (hypothetical DNA testing results must be "assumed valid" by trial court when considering a motion for DNA testing).

In this case, the trial court determined that the item of evidence White sought to test—workout pants worn by the victim during the incident giving rise to this case—had been stored for nearly 20 years in a warehouse with no temperature or humidity control. The trial court also noted testimony from a forensic expert that heat, humidity, and light generally have a deleterious effect on biological specimens. Based on that evidence, the trial court concluded that there was a substantial likelihood that the biological specimens, namely epithelial skin cells presumed to be located on the pants, had been materially altered by the effects of light, heat, and humidity, such that the requested testing would no longer meet the standards set forth in OCGA § 5-5-41 (c). The trial court thus ruled that White had failed to establish the factors set forth in OCGA § 5-5-41 (c) (7) (A) and (B) and denied his petition for DNA testing.

Following the denial of his motion for reconsideration by the trial court, White filed an application for discretionary review, which this Court granted. This appeal followed.

4

1. As this appears to be the first opportunity for this Court to review a trial court's ruling under OCGA § 5-5-41 (c) (7) (A) and (B), we must first determine the appropriate legal standard to be applied by the trial court in its consideration of the petitioner's motion under those provisions as well as this Court's standard of review. *Cf. Crawford v. State*, 278 Ga. 95, 96-99 (2) (597 SE2d 403) (2004) (considering whether petitioner had complied with pleading requirements set forth in OCGA § 5-5-41 (c) (3) and (4)); *Williams v. State*, 289 Ga. App. 856 (658 SE2d 446) (2008) (affirming denial of motion where no evidence in trial record established that identity of perpetrator was an issue in the case).

We first note that out-of-time motions for a new trial made pursuant to OCGA § 5-5-41 (a) and (b) are reviewed for abuse of discretion where the basis for the request is that new evidence has been discovered. *See Drane v. State*, 291 Ga. 298, 300-01 (2) (728 SE2d 679) (2012) ("an extraordinary motion for a new trial, as contrasted with a motion for a new trial made within 30 days of a judgment, is not favored; consequently, a stricter rule is applied to an extraordinary motion for a new trial based on the ground of newly available evidence than to an ordinary motion on

5

that ground." (citation and punctuation omitted)).[2] Petitions for DNA testing pursuant to OCGA § 5-5-41 (c) are "subject to the provisions of subsections (a) and (b)" of OCGA § 5-5-41 governing extraordinary motions for new trial,[3] and a motion for DNA testing is a preliminary matter and will either precede or accompany any motion for a new trial predicated upon the discovery of exculpatory DNA evidence. *See State v. Clark*, 273 Ga. App. 411, 415 (1) (615 SE2d 143) (2005) (noting that a motion for DNA testing may be filed before or in conjunction with the filing of extraordinary motion for new trial).

---

[2] In that posture, the petitioner must satisfy the requirements set forth in *Timberlake v. State*, 246 Ga. 488, 491 (1) (271 SE2d 792) (1980), which provides that

It is incumbent on a party who asks for a new trial on the ground of newly discovered evidence to satisfy the court: (1) that the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that he did not acquire it sooner; (3) that it is so material that it would probably produce a different verdict; (4) that it is not cumulative only; (5) that the affidavit of the witness himself should be procured or its absence accounted for; and (6) that a new trial will not be granted if the only effect of the evidence will be to impeach the credit of a witness.

[3] OCGA § 5-5-41 (c) (1).

The language of OCGA § 5-5-41 (c) (7) provides that the court "*shall grant* the motion for DNA testing" so long as each of the seven factors listed in that subsection have been "established" by the petitioner (emphasis supplied). Although "establishing" a fact is not necessarily the same as "proving" it, a trial judge will necessarily be called upon to resolve factual issues in determining whether the petitioner has "established" each of the seven criteria set forth in OCGA § 5-5-41 (c) (7). When faced with conflicting evidence or disputed testimony, we generally afford some deference to the fact-finder to assess the credibility of witnesses and weigh the evidence presented, and such deference is no less critical in a trial court's inquiry under OCGA § 5-5-41 (c). Consequently, the trial judge reviewing a motion for DNA testing sits as the trier of fact and based on the evidence presented must determine whether the criteria set forth in OCGA § 5-5-41 (c) (7) have been met and whether there is a reasonable probability that the DNA evidence sought by the petitioner, had it been available at his or her trial, would have resulted in a different outcome.[4]

---

[4] *See Crawford*, 278 Ga. at 97-98 (2) (a) (noting trial court's weighing of presumed DNA evidence against other evidence of guilt presented at trial); OCGA § 5-5-41 (c) (6) (E) ("The purpose of the hearing shall be to allow the parties to be heard on the issue of . . . whether upon consideration of all the evidence there is a reasonable probability that the verdict would have been different if the results of the requested DNA testing had been available at the time of trial, and whether the requirements of [OCGA § 5-5-41 (c) (7)] have been established").

7

This is similar to a trial court's role in considering a claim of ineffective assistance of counsel as part of a post-conviction motion for new trial. In that posture, the trial court sits both as the finder of fact in regard to any alleged deficiency and then ultimately determines whether the deficiency, if any, affected the trial verdict. *See, e.g., Green v. State*, 302 Ga. 816, 817-18 (2) (809 SE2d 738) (2018). As our Supreme Court has further explained,

> [A]lthough both the performance and prejudice components of an ineffectiveness inquiry involve mixed questions of law and fact, a trial court's factual findings made in the course of deciding an ineffective assistance of counsel claim will be affirmed by the reviewing court unless clearly erroneous.

*Green*, 302 Ga. at 818 (2) (citation omitted). However, in considering a claim of ineffectiveness, this Court is to "independently apply the legal principles to the facts." *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012) (citation and punctuation omitted).

We believe this sort of bifurcated standard of review is consistent with the role of the trial and appellate courts under the DNA testing statute. The DNA statute clearly situates the trial court as the trier of fact and calls upon it to render legal conclusions based on its findings. *See* OCGA § 5-5-41 (c) (6) (E) and (c) (7). The

8

trial court is ideally situated to weigh the credibility of the evidence presented to it in support or opposition to a motion under OCGA § 5-5-41 (c) and to weigh such evidence in making factual determinations. *See Handley v. State*, 289 Ga. 786, 787 (2) (a) (716 SE2d 176) (2011) (noting that credibility determinations of trial court are to be accepted unless clearly erroneous). However, although this Court should be highly deferential to a trial court's factual determinations under OCGA § 5-5-41 (c), this Court is equally capable of applying the provisions of the statute to such facts and to determine whether the facts found by the trial court support its legal conclusions.

Thus, factual findings under OCGA § 5-5-41 (c) will be upheld by this Court unless they are clearly erroneous, but this Court will independently apply the DNA statute to the trial court's findings. With those standards in mind, we turn now to a review of the trial court's consideration of White's motion.

2. Based on our review of the record, we find that the trial court misapplied the law in determining whether White had satisfied the requirements of OCGA § 5-5-41 (c) (7). Consequently, the trial court's order must be vacated, and this case must be remanded to the trial court for additional proceedings.

Here, although there is support in the record for the trial court's general conclusion that the biological material, if any, on the evidence in question may have

9

degraded due to the effects of time, heat, and light, that was not the proper inquiry that was before the trial court. Instead, the trial court was charged with determining whether the petitioner had established each of the factors set forth in OCGA § 5-5-41 (c) (7) and whether, in the judgment of the trial court, there is a reasonable probability that the verdict in White's trial would have been different if the results of the DNA testing he seeks had been available at the time of the trial. Our review of the record of the proceedings on White's motion reveals that this was not the inquiry engaged in by the trial court below.

At the first hearing on White's motion, White's attorneys proffered evidence[5] establishing that the crimes for which White was convicted involved a struggle with a woman who was wearing a pair of spandex pants. The perpetrator attacked her from behind and ripped her pants in the course of trying to pull them down with his hands. The victim escaped from the struggle while still wearing the torn pants. The pants were placed in the chain of custody and had been in storage since White's trial.

---

[5] At the initial hearing on this motion, no witnesses were called. The State had initially indicated that it would consent to White's request for DNA testing, but the record reflects that it withdrew its consent the morning of the initial hearing. As no witnesses were present, the judge simply received arguments from counsel summarizing their understanding of the case as well as the testimony they would have presented had witnesses been called.

The State proffered the testimony of its own expert who had stated that "touch DNA" (as opposed to blood or semen) yields "sketchy results . . . if the material is old." The expert had indicated to the State that temperature and storage conditions would also affect any testing performed. The expert had also indicated to the State that because the pants had been used as an exhibit in White's trial (albeit not as evidence containing potential DNA samples), any sample would be compromised, diminishing the probability that any probative results would be found through testing. At the close of the hearing, the judge took the matter under advisement.

The judge held a second hearing on the motion, and White called the manager from the Georgia Bureau of Investigation (GBI) Forensic Biology Section to testify. The witness was tendered as an expert in forensic biology and DNA testing without objection from the State.

The expert testified that so-called "contact DNA" is DNA that is recovered from skin cells based on contact with an object or an item of evidence. He further testified that the GBI had in the past been able to obtain a contact DNA profile from articles of clothing. He noted that not all items of evidence submitted for DNA testing are ultimately found to contain contact DNA or skin cells. However, he noted that skin cells can be seen under a microscope and that, when an article of clothing is

submitted for testing, samples are taken from portions of the clothing where skin cells can be seen. He noted that until an item of evidence is viewed under a microscope, there is no way to tell if there are skin cells on that item.

The expert further testified that skin cells are transferred to an item by touching and that the higher frequency with which an item is touched increases the chance that skin cells are transferred. He noted that, with regard to the spandex pants White is seeking to test, a GBI analyst would first try to isolate the area in which the assailant grabbed the pants in order to rip them. He stated that, although the perpetrator was unlikely to have touched the pants with great frequency, due to the friction and the force with which the perpetrator attempted to pull the pants down, it is possible that the perpetrator's skin cells were deposited on the pants during the struggle. He opined that it was possible other DNA profiles could appear on the pants, as they had been handled by the district attorney at trial and presumably other individuals. However, he emphasized that only testing of the pants would determine whether any DNA profiles could be found on them and that the analyst would have no idea what the results would be prior to testing.

The expert testified that age impacts the evidence, noting that over time the DNA is going to be degraded. He noted that, with skin cells specifically, there may

12

not be many cells present on the evidence to begin with, the cells may degrade to the point where a useful DNA profile cannot be obtained. He noted again, however, that only through the DNA testing process could GBI determine whether there was contact DNA on the item of evidence that could be tested for a profile. He also testified that there would be no way to know if the evidence would contain DNA profiles for multiple individuals until the testing is actually performed.

The expert stated that he did not know whether the spandex pants had been kept in a light- and temperature-controlled environment, with measures in place to prevent contamination. He noted that heat and light would generally cause contact DNA to degrade, but testified that he did not know if heat and light caused the alleged skin DNA to degrade in this case. He explained that degradation was likely to occur even if the evidence was stored at room temperature, but that higher temperatures would likely accelerate the rate of degradation. He noted that an analyst would not know how much contact DNA on an item of evidence had degraded until the item was subjected to a DNA analytical process.

In response to questions from the trial court, the expert noted that in order to identify whether any DNA found on the evidence tested belonged to a specific individual, the sample would have to be compared with a sample from that individual.

In response to further questioning by the court, the expert stated that, given the length of time since White's trial and assuming the evidence was not housed properly, it was his opinion that there was "a very, very slim chance that you would get something useful" from any testing that could be performed. However, he explained that it was possible, even in light of those conditions, that *a useful sample of DNA could be found* on the pants. He noted again that there was no way to know whether the item contained a useful contact DNA sample until it was tested.

Based on this testimony, the trial court ruled that there was a substantial likelihood that the biological specimens, namely epithelial skin cells presumed to be located on the pants, had been materially altered by the effects of light, heat, and humidity, such that the requested testing would no longer meet the standards set forth in OCGA § 5-5-41 (c). The trial court thus ruled that White had failed to establish the factors set forth in OCGA § 5-5-41 (c) (7) (A) and (B) and denied his petition for DNA testing. However, the trial court's findings regarding the degradation of the biological material on the pants were inapposite to the set of legal conclusions OCGA § 5-5-41 (c) directs it to draw. It was not up to the trial court to determine from the testimony presented whether sufficient DNA, if any, was transferred to the spandex pants during the attack on the victim or whether it had deteriorated. Rather, the proper

question was whether the pants were in a condition that would allow for the requested test to be conducted. Although the witnesses were doubtful that the pants might still contain testable biological material, they could not categorically deny that testable and usable DNA would be found when the pants were subjected to the GBI's testing protocol.

Moreover, that any *DNA* transferred to the pants during the struggle between the victim and the perpetrator may have degraded over time, been altered, or become unusable does not speak to whether the *evidence*—the pants—were available for testing and had been subject to a chain of custody. Under the DNA statute, the evidence to be tested is not the same as the DNA potentially contained therein, as the statute draws a clear distinction between the two. *See* OCGA § 5-5-41 (c) (3) (A) (providing that the petitioner must show that "*[e]vidence* that potentially contains *[DNA]* was obtained in relation to the crime[.]" (emphasis supplied)). This is a critical statutory distinction that the trial court's consideration of White's motion failed to make.[6]

---

[6] In its brief, the State provided a lengthy survey of DNA testing statutes in effect in other jurisdictions. However, while the State argues that reading Georgia's testing statute in conjunction with its counterparts from other jurisdictions supports its contention that White and other similarly situated Georgians carry the burden of establishing that DNA on the evidence to be tested has not been degraded or altered,

15

Finally, the portions of the DNA statute analyzed by the trial court require the petitioner to make only a threshold factual showing of the listed factors, namely that the evidence to be tested is available and that it has been subject to a chain of custody. The statute does not permit the trial court to speculate as to the viability of any DNA potentially located on the evidence in question. To permit such speculation to factor into whether the petitioner should be afforded the right to test the evidence for DNA in the first instance violates the clear directive of the General Assembly and, as a practical matter, would likely exclude DNA testing of all but the most recently

_____

the opposite is true. In fact, the State's survey of state and federal DNA testing statutes only illustrates the range of policy choices before the General Assembly in determining what criteria a petitioner must satisfy before testing is to be permitted. As White noted in response to the State's argument, in the taxonomy of DNA statutes, the General Assembly elected something of a middle ground when it imposed the availability and chain of custody requirements set forth in OCGA § 5-5-41 (c) (7) (A) and (B). For instance, some states appear to have placed a more minimal threshold burden on petitioners in establishing their right to test evidence for DNA. *See, e.g.*, R.I. GEN. LAWS § 10-9.1-12 (no requirement to show a chain of custody for DNA testing petitions in Rhode Island). However, Massachusetts has imposed the requirement that the petitioner make a showing, by a preponderance of the evidence, that the biological material on the evidence in question has not deteriorated such that requested analysis would lack probative value. *See* MASS. GEN. LAWS ch. 278A, § 7 (b) (2). Reference to this limited sample of statutory approaches simply belies any notion that jurisdictions in the United States have uniformly placed the burden on petitioners to demonstrate, at the outset, that the *biological material* thought to be present on the evidence to be tested has not been altered or degraded. In any event, that is not the law in Georgia.

and pristinely stored physical evidence. That violates both the spirit and the letter of OCGA § 5-5-41 (c).

Thus, because the trial court here misapplied the law, we vacate the order denying White's motion and remand the matter to the trial court for further proceedings consistent with this opinion. *See Welbon v. State*, 301 Ga. 106, 109-10 (2) (799 SE2d 793) (2017) ("Where the trial court has used a wrong standard in reaching its conclusion, a remand may be appropriate"). In light of the legal standards announced in this opinion and the relatively undeveloped state of the law at the time the trial court considered White's motion, the trial court may, in the interests of justice, elect to hold a new hearing on this matter so that White and the State may present evidence and arguments both as to the factors set forth in OCGA § 5-5-41 (c) (7) and as to whether there is a reasonable probability that the verdict in White's trial would have been different if the results of his requested DNA testing had been available at the time. *See* OCGA § 5-5-41 (c) (6) (E).

*Judgment vacated and remanded. Ellington, P. J., and Gobeil, J., concur.*